**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**SAFWAY STEEL SCAFFOLDS COMPANY OF GEORGIA, Respondent.**

No. 23548.

United States Court of Appeals
Fifth Circuit.

Sept. 7, 1967.

Rehearings Denied Oct. 24, 1967.

Marcel Mallet-Prevost, Asst. Gen. Counsel, N. L. R. B., Clarice Feldman, Atty., N. L. R. B., Washington, D. C., Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Allison W. Brown, Jr., Atty., N. L. R. B. for petitioner.

P. D. Thomson, John K. Aurell, Paul & Sams, Miami, Fla., for respondent.

Before PHILLIPS,* THORNBERRY and DYER, Circuit Judges.

THORNBERRY, Circuit Judge:

The National Labor Relations Board seeks enforcement of an order based upon a finding that respondent, Safway Steel Scaffolds Company of Georgia, violated sections 8(a) (1), 8(a) (3), and 8(a) (5) of the National Labor Relations Act, 29 U.S.C. §§ 158(a) (1), (a) (3), (a) (5). In March, 1964, two months before expiration of the collective-bargaining agreement, the union advised the company that it desired to negotiate.[1] The company replied that meetings would have to be delayed but offered to "save negotiation time and expense" by extending the existing contract for one year. Representatives of the union rejected this offer, saying they wanted to negotiate five items, including a wage increase

of twenty cents "across the board." Meetings were held between May 4 and August 13, 1964. At the meetings, representatives of management insisted on wage reductions up to twenty-nine cents per hour for warehousemen and fifteen cents for drivers (which meant an hourly wage of $1.45 for warehousemen and $1.75 for drivers). On June 30 the union notified the company that the employees would strike on the following day, and on July 1 six of the company's eight employees did, in fact, go on strike. After receiving notification of strike on June 30, the company announced it would put in effect the wage reduction previously threatened;[2] and on July 1 warehousemen were reduced by twenty-nine cents and drivers by fifteen cents. Also on July 1, the company advised each striker by letter that he would be discharged if he did not return by July 6. The six strikers plus a seventh employee who had been hospitalized at the commencement of the strike chose to accept discharge.

In August, 1964, a mediator made two attempts to reconcile the parties. At the second meeting of August 13, the union agreed to accept the exact terms of the old contract; but the company insisted on wage reductions and other changes unfavorable to the union. On September 18 the union notified the company by telegram that the strikers would return to work unconditionally and on September 21 all seven reported to the plant; but the manager, Mr. John Wallace, turned them away.[3] Eventually, five of the seven were hired at the reduced rates.

Unfair-labor-practice charges had been filed with the Board on August 14. After a hearing in February, 1965, the trial examiner concluded that the company, by

---

* Of the Tenth Circuit, sitting by designation.

1. Local 290, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America.

2. General Counsel's Exhibit No. 12 is a letter written on June 15 from Safway to David Frechette. It suggests that the company had already selected July 1 as

the date on which to reduce wages. This was before the union had responded to changes in the contract proposed by the company on May 28.

3. After turning away the seven strikers, the manager apparently had a second thought; for he offered reinstatement to two drivers at the reduced rate as the group was leaving the plant. None returned on that date.

its entire course of conduct, had attempted to undermine the union and had refused to bargain in good faith, thus violating sections 8(a) (1) and 8(a) (5) of the Act. He further held that the refusal to bargain in good faith caused the strike and that the employees were therefore unfair-labor-practice strikers entitled to reinstatement upon unconditional application. The refusal to reinstate constituted discrimination in violation of section 8(a) (3). The examiner recommended that the company be ordered to cease and desist from the unfair practices found and that it be enjoined from infringing in any manner upon the rights to organize and engage in concerted activities as guaranteed by section 7. Affirmatively, he recommended that the company be required to bargain with the union upon request, to revoke the unilateral wage scale adopted on July 1, to offer reinstatement to two employees, to make whole all employees for economic losses suffered by reason of the discrimination found or by reason of the unilateral wage reductions, and to post appropriate notices of its obligations under the order. The Board adopted the trial examiner's recommendations in full. After careful review of the record, we conclude that there is substantial evidence to support enforcement of the Board's order except to the extent that it would enjoin the company from violating section 7 "in any other manner." This part of the order is overbroad and will not be enforced.

## I. Alleged Procedural Errors

Before considering the unfair labor practices in dispute, we will dispose of respondent's contention that procedural errors committed by the trial examiner require reversal. First, it is asserted that the examiner erred in denying a motion for leave to take depositions.[4] In a nutshell, respondent argues that it needed to take depositions in order to probe the oral accounts forming the basis for the Board's charges, that the examiner was wrong in ruling that the Act does not provide for discovery, and that this error prejudiced its substantial rights and constituted a denial of due process. In his ruling, the examiner relied principally upon NLRB v. Globe Wireless, 9th Cir. 1951, 193 F.2d 748, 751, wherein the court held that the refusal to allow the taking of depositions was not a denial of due process since the Act does not provide for pretrial discovery.

Section 10(b) of the Act would appear to give a trial examiner authority to permit the taking of depositions in any case where such a procedure would be practical:

Any such [unfair labor practice] proceeding shall, so far as practicable, be conducted in accordance with the rules of evidence applicable in the district courts of the United States under the rules of civil procedure for the district courts of the United States, * * *[5]

However, the practicality of having pretrial discovery in labor proceedings has been somewhat uncertain. In 1960, Member Jenkins submitted a committee's proposals for changes in the Board's rules and regulations. 45 L.R.R.M. 94, 101 (1960). Among other things, he noted that it would be desirable to have pretrial discovery but that it would not be feasible for trial examiners to preside over the taking of all depositions. He went on to say that there was no reason why the inability of examiners to preside should be an insuperable obstacle:

Personally, I can see no reason why such depositions could not be taken by either party as a matter of right before anyone authorized by the state or Federal government to take oaths, if some means could be devised for enforcing this right without having to

4. Respondent made two motions—one to take oral depositions and the other to take depositions on written interrogatories. Both were denied for the same reason.

5. Fed.R.Civ.P. 26–37 govern pretrial discovery in civil cases to be tried in federal district courts. Rules 26–32 set out detailed procedures for taking depositions upon oral examination and written interrogatories.

resort to the tedious and time-consuming process of obtaining a court order to enforce the right of deposition.

The Board was persuaded by this comment and evidently did not visualize any real problem of enforcement; for its rules and regulations now provide a detailed procedure for the taking of depositions if in the judgment of the trial examiner good cause has been shown. NLRB: Statements of Procedure, Rules and Regulations §§ 102.30, 102.35 (Lab. Rel.Rep. LRX 4058, 4060). In light of section 10(b) and of these new rules, which were in effect when the hearing in the instant case was conducted, we must conclude that the examiner was wrong in holding that there is absolutely no provision for pretrial discovery.

 It is within the trial examiner's discretion to grant or deny a motion for leave to take depositions, but here the examiner did not believe he had any discretionary authority to exercise.[6] We will assume, therefore, that respondent showed good cause for granting the motion and that a procedural error was committed. The question remains whether the error was prejudicial. It is clear that in ordinary civil cases tried in federal courts, an appeal based on an infraction of the rules will not succeed unless the infraction was substantial enough to prejudice the appellant's case. Bell v. Swift & Co., 5th Cir. 1960, 283 F.2d 407; Tiedman v. American Pigment Corp., 4th Cir. 1958, 253 F.2d 803; Fed.R.Civ.P. 61; Wright, Federal Courts, § 81, at 312 (1963). Applying this same standard of review, we conclude that the denial of the motion for leave to take depositions was a technical error which did not result in prejudice to respondent's case.

 The Board's finding of unfair labor practices was predicated in part on alleged statements by respondent's manager, Mr. John Wallace, which tended to undermine the union and in part on a unilateral reduction in wages before a bargaining impasse had been reached. The unilateral reduction in wages was determined by looking to the chronology of events about which there is no dispute. Respondent could not have shed a different light on this matter by engaging in pretrial discovery. The alleged statements by Wallace were reported by the strikers, especially by Frank Edward Cogdel. These men were all available to testify as witnesses, and the company had ample opportunity to discredit their accounts by cross-examining those who testified for the General Counsel or by presenting rebuttal testimony.[7] Further, the company was given an opportunity to examine a statement made before the hearing by Frank Edward Cogdel to an attorney for the Board. In all, it appears that respondent had a full and fair hearing and that its rights were not prejudiced by the procedural defect. In Bell v. Swift & Co., 5th Cir. 1960, 283 F.2d 407, 409, this Court made it clear that where a trial is conducted properly and all evidence is heard, the failure of the trial judge to allow discovery will not amount to prejudicial error.

Respondent complains of a second procedural error necessitating reversal. Witness David Frechette, a union official, testified as to matters discussed during the various meetings. On cross-

6. NLRB v. Movie Star, Inc., 5th Cir. 1966, 361 F.2d 346, 352 and Trojan Freight Lines, Inc. v. NLRB, 6th Cir. 1966, 356 F.2d 947 both involved the procedural question now before us. In each case, the court held that there was no abuse of discretion in denying the motions for pretrial discovery. In NLRB v. Southern Materials Co., 4th Cir. 1965, 345 F.2d 240, 244, on the other hand, the Fourth Circuit said in dictum that the Board should generally allow pretrial discovery inasmuch as it acts in a quasi-judicial capacity.

7. Respondent complains that the trial examiner arbitrarily limited testimony so that it was unable to present witnesses whose testimony might have been vital. However, it is clear that the examiner was simply instructing the General Counsel to avoid cumulative testimony. He expressly stated that he did not intend to limit rebuttal evidence. R., 66–68.

examination, counsel for the company elicited from him the fact that he had an interview with an attorney for the Board prior to the hearing and that the attorney took notes during the interview. The trial examiner said that the General Counsel could not be required to produce these notes for respondent's inspection because they were not signed or otherwise approved by the witness.[8] This ruling is assigned as error.

■ The Jencks Act, 18 U.S.C. § 3500, permits the production of statements by a government witness who has testified on direct examination in a criminal trial. Statements are producible if they meet the requirements of either the first or second clause of subsection (e) of the statute. Under the first clause, a written account of an interview between government agent and government witness is producible if it has been signed "or otherwise adopted or approved" by the witness. Under the second clause, the written account is producible if it is a "contemporaneous" and "substantially verbatim" recording or transcription of the interview. The reproduction contemplated by the second clause can be manual as well as mechanical. Palermo v. United States, 1959, 360 U.S. 343, 79 S.Ct. 1217, 3 L.Ed.2d 1287; United States v. Waldman, D.N.J.1958, 159 F. Supp. 747. The phrase "substantially verbatim" does not mean "precisely verbatim" though the writing must not contain the comments, impressions, or opinions of the agent. Williams v. United States, 1964, 119 U.S.App.D.C. 177, 338 F.2d 286; United States v. McKeever, 2d Cir. 1959, 271 F.2d 669.

■ In Ra-Rich Manufacturing Corp., 1958, 121 N.L.R.B. 700, the Board accepted the rules for production of state-

ments as established by the Jencks Act and the case of Jencks v. United States, 1957, 353 U.S. 657, 77 S.Ct. 1007, 1 L. Ed.2d 1103.[9] Thereafter, the Board amended its rules and regulations to cover its decision in the *Ra-Rich* case; but in so doing it limited the right of production to written statements signed or otherwise approved by the witness. NLRB: Statements of Procedure, Rules and Regulations § 102.118 (Lab.Rel.Rep. LRX 4079). While this limitation doubtless explains why the trial examiner would not require production of the notes taken during Frechette's interview, we must agree with the Ninth Circuit's conclusion that the Board's rules would be arbitrary and invalid to the extent that they did not also require the production of substantially verbatim transcriptions of oral statements not signed or otherwise approved by the witness. Harvey Aluminum, Inc. v. NLRB, 9th Cir. 1964, 335 F.2d 749, 753, 756.

■■ In Saunders v. United States, 1963, 114 U.S.App.D.C. 345, 316 F.2d 346, a government attorney had taken notes during his interview with a government witness. The appellate court held that the trial judge erred in failing to examine the notes to determine whether they were a substantially verbatim recital of what the witness had said. We believe that the trial examiner in the instant case erred for the same reason. Again, however, we conclude that the procedural defect did not prejudice respondent's case. David Frechette simply gave his version of the negotiations; his testimony did not form the basis for any of the Board's findings. If his testimony were disregarded entirely, we would still find substantial evidence in the record to justify enforcement of the order issued by the Board.[10]

8. The examiner denied respondent's motion after learning from the witness that he had not signed or otherwise approved the notes. The examiner did not look at them.

9. The Second Circuit held that the rule of the *Jencks* case applies to Board proceedings in NLRB v. Adhesive Prods.

Corp., 2d Cir. 1958, 258 F.2d 403. This holding was expressly accepted by the Board in *Ra-Rich*.

10. We find respondent's complaint of a third procedural error to be without merit. Though counsel for the company had studied Frank Edward Cogdel's pretrial statement before cross-examining him, he

II. Violations of Sections 8(a) (1), (a) (3), and (a) (5)

 As in all cases involving judicial review of administrative decisions, we begin with the often-repeated principle that the Board's order must be sustained if supported by substantial evidence in the record considered as a whole. NLRB v. Brown, 1965, 380 U.S. 278, 85 S.Ct. 980, 983, 13 L.Ed.2d 839, 849; Universal Camera Corp. v. NLRB, 1951, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456. Accordingly, if the Board's determination is based upon such relevant evidence as a reasonable mind might accept as adequate to support it, we are not at liberty to deny enforcement simply because the evidence may also reasonably support other conclusions or because we might justifiably have reached a different conclusion had the matter come before us de novo. NLRB v. Camco, Inc., 5th Cir. 1966, 369 F.2d 125, 127. With this standard in mind, we turn to the unfair labor practices found by the Board.

 Section 8(a) (1) makes it an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7." Section 7 gives employees the right to organize, to bargain collectively, to engage in concerted activities for the purpose of collective bargaining and also the right to refrain from engaging in any or all of these activities. Section 8(a) (5) makes it an unfair labor practice for an employer to refuse to bargain in good faith with properly selected representatives of the employees. The Board based its finding that these two sections were violated on the company's whole course of conduct between May and August, 1964 but particularly on statements allegedly made by Mr. John Wallace to the employees. Two employees—Frank Edward Cogdel, the shop steward, and John Wesley Cogdel— testified that on May 15, 1964 Mr. Wallace read the entire collective-bargaining agreement to all of the employees and then proceeded to tell them that he was determined to "get rid of the union." Frank Edward Cogdel further testified that on two occasions in June Mr. Wallace told him that there was no need for a union and that the employees need not be concerned about a cut in pay if they would abandon it. Quincy Knox (the hospitalized employee who joined the strikers late) said that on July 6 Wallace told him that he could return to work for $1.45 per hour but that he would not feel the impact of this cut if he would simply withdraw from the union and quit paying dues. On the basis of these statements and of the persistence with which the company's negotiators demanded a reduction in wages, the trial examiner concluded that the company had not bargained in good faith and had restrained the employees in the exercise of rights guaranteed under section 7. The examiner felt that the demands for reduced wages and other unfavorable changes were motivated by anti-union sentiment since the company had offered to extend the terms of the old agreement before negotiations ever began.[11]

Of course, respondent presented some rather persuasive rebuttal evidence. First, it offered witnesses whose testimony tended to support the position that it demanded a reduction in wages be-

asked to see the statement again before cross-examining John Wesley Cogdel. This motion was denied. Regardless of whether the Jencks Act requires production under these circumstances, it is inconceivable that respondent's case was prejudiced by denial of the motion since its attorney had already familiarized himself with the contents of the statement.

11. Certain changes demanded by the company indicate that it was determined to be rid of the union or at least to weak-

en it and was not making a bona fide effort to reach agreement. For example, the company proposed to eliminate the union security provided by a dues checkoff, to eliminate the requirement that the union be notified of an employee's discharge, and to insert a requirement that a union official receive permission before visiting an employee on company premises. These changes were obviously unrelated to the company's avowed purpose of achieving greater economy of operations.

cause it was pricing itself out of the market by paying higher wages than competitors. Second, it offered evidence which tended to show that Mr. Wallace could not have made the statements he allegedly made to Frank Edward Cogdel on two separate occasions in June because he was not at the plant on either of those days. The making of the statements to all employees in May and to Quincy Knox in July was denied but not effectively refuted. Although this rebuttal evidence might have led us to a different result had we been the original triers of fact, we cannot, under the substantial-evidence rule, say that the Board, following the examiner, was unreasonable in believing the employees or that its findings were not based upon such relevant evidence as a reasonable mind might accept.

Any uneasiness we might have about the credibility of Frank Edward Cogdel, the General Counsel's principal witness, is overcome by the fact that respondent clearly violated section 8(a) (5) when it reduced wages on July 1. As early as June 15, the company hinted that it planned to reduce wages on July 1; and when advised on June 30 that a strike would start the following day, it announced that the plan would be put into effect. The law is clear that unilateral changes in terms under negotiation constitute bargaining in bad faith if made before there is an impasse. NLRB v. Katz, 1962, 369 U.S. 736, 82 S.Ct. 1107, 8 L.Ed.2d 230. In the instant case, a bargaining impasse had not been reached when the unilateral change was made. The union appears to have been willing to negotiate at all times—in fact, it was constantly revising proposals until finally it announced in August that it was prepared to accept the exact terms of the expired contract. The company, while less compromising, did revise its wage proposal upward just before putting into effect the reduction of fifteen cents for drivers and twenty-nine cents for warehousemen.[12] Further, the con-

duct of Mr. Wallace indicates that the company was not making a bona fide effort to reach agreement. Where good faith on the part of management is lacking, the courts will not recognize the existence of a bargaining impasse. NLRB v. Herman Sausage Co., 5th Cir. 1960, 275 F.2d 229, 234; NLRB v. Andrew Jergens Co., 9th Cir. 1949, 175 F.2d 130, 136, cert. denied, 338 U.S. 827, 70 S.Ct. 76, 94 L.Ed. 503. The only factor which might seem to reflect the existence of an impasse would be the strike, but the use of economic pressure by a union does not relieve the company of the duty to bargain. As Judge Brown stated in NLRB v. Rutter-Rex Mfg. Co., 5th Cir. 1957, 245 F.2d 594, 596, "A strike does not in and of itself suspend the bargaining obligation".

Section 8(a) (3) prohibits discrimination by an employer "in regard to hire or tenure of employment or any term or condition of employment". The Board's determination that this section was violated by the company's refusal to reinstate the strikers upon unconditional application rests upon the finding that the men were engaged in an unfair-labor-practice strike as opposed to an economic strike. A strike is characterized in this way so as to give employees the right to be reinstated if an unfair labor practice had anything to do with causing it. Mastro Plastics Corp. v. NLRB, 1956, 350 U.S. 270, 76 S.Ct. 349, 100 L.Ed. 309; NLRB v. American Aggregate Co., 5th Cir. 1962, 305 F.2d 559. As we have agreed that respondent violated sections 8(a) (1) and (a) (5), the conclusion that the strike was caused in part by unfair labor practices is unavoidable. Even if there were no unfair labor practice other than the unilateral reduction in wages, the strike would still have been the kind which entitled the employees to reinstatement. It is true that the reduction in wages occurred on the same day the strike began so that it would not have been the initial cause of the strike, but this unilateral change would nevertheless

12. On June 29 the company revised the proposed wage reduction to twenty-four cents for warehousemen and ten cents for drivers.

have contributed to the continuation of the strike. Where an unfair labor practice intervenes to prolong a strike, the employer is bound to reinstate all strikers. General Drivers & Helpers Union, Local 622 v. NLRB, D.C.Cir. 1962, 302 F.2d 908; NLRB v. Crosby Chemicals, Inc., 5th Cir. 1951, 188 F.2d 91; NLRB v. Remington Rand, Inc., 2d Cir. 1942, 130 F.2d 919, 929.

### III. Enforcement of the Board's Order

 As previously noted, the Board ordered the company to cease and desist from its unfair labor practices and enjoined it from infringing in any manner upon the rights to organize and engage in concerted activities as guaranteed by section 7 of the Act. Affirmatively, it ordered the company to bargain upon request, to revoke the unilateral wage scale adopted on July 1, 1964 and revert to the wage scales and benefits in force prior to that date, to offer reinstatement to Frank Edward and John Wesley Cogdel, to make whole all employees for economic losses suffered by reason of the discrimination found or by reason of the unilateral wage reductions, and to post an appropriate notice of its obligations under the order. Since we have affirmed the finding that respondent transgressed sections 8(a) (1), (a) (3), (a) (5), we accordingly grant enforcement of the entire order with the exception of that part which enjoins the company from violating section 7 "in any other manner."[13] This broad provision is denied.

In NLRB v. Southwire Co., 5th Cir. 1965, 352 F.2d 346, 349, and more recently in Southwire Co. v. NLRB, 383 F.2d 235, 5th Cir. 1967, this Court considered sweeping injunctions against any violation of section 7. In the earlier case,

the Board's order was limited to the specific violations found:

> While this Court has approved orders prohibiting conduct beyond the specific acts found by the Board to amount to unfair labor practices, when we found it appropriate to affirm the Board's finding that the respondent had "demonstrated a proclivity to violate the act," Truck Drivers & Helpers Local Union No. 728 v. NLRB, 5 Cir., 332 F.2d 693, 697, our attention has not been called to any case in which we have approved an order as broad as that here urged upon us by the Board. This order would amount to an injunction against any violation of Section 7. We think the record before the Trial Examiner does not warrant an order of such breadth.

In the more recent Southwire case, the Court decided that the company had demonstrated a proclivity to violate certain sections of the Act but that the injunction against any violation of section 7 was still too broad. Reliance was placed upon NLRB v. Express Publishing Co., 1941, 312 U.S. 426, 433, 61 S.Ct. 693, 698, 85 L.Ed. 930, 935, wherein the Supreme Court warned against an order so broad as to contemplate enforcement by the courts in contempt proceedings where violations would be involved which were unrelated to the ones found by the Board:

> It would seem equally clear that the authority conferred on the Board to restrain the practice which it has found the employer to have committed is not an authority to restrain generally all other unlawful practices which it has neither found to have been pursued nor persuasively to be related to the proven unlawful conduct.

---

13. Although respondent does not argue in its brief that this provision is overbroad, it does make a proper exception to the provision. Exception § 32 filed by the company to the examiner's findings and recommended order reads as follows: "The Trial Examiner erred in finding that in any way Respondent interfered with, restrained or coerced employees in the exercise of their rights guaranteed by Section 7 of the Act, in violation of § 8 (a) (1) of the Act, *or in recommending that respondent be restrained from violating such Sections in the future.* (Emphasis added)

In the instant case, there was no showing of a proclivity to violate the Act or certain sections of the Act. To avoid the undesirable consequence envisioned by the Court in the Express Publishing case, we therefore deny enforcement of the broad provision against any violation of section 7.

Enforced in part; denied in part.