NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

AMERICAN ART INDUSTRIES, INC.,
Respondent.

No. 26543.

United States Court of Appeals
Fifth Circuit.

Sept. 5, 1969.

Rehearing Denied Nov. 20, 1969.

Marcel Mallet-Prevost, Asst. Gen. Counsel, Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Allison W. Brown, Jr., Lawrence J. Sherman, Ronald W. Egnor, Attys., N.L.R.B., Washington, D. C., Harold A. Boire, Director, Region 12, N.L.R.B., Tampa, Fla., for petitioner.

Joseph A. Perkins, Hilary Silverman, Miami, Fla., for respondent.

Before WISDOM and MORGAN, Circuit Judges, and DAVIS*, Court of Claims Judge.

* Judge Oscar H. Davis, U. S. Court of Claims, Washington, D. C., sitting by designation.

LEWIS R. MORGAN, Circuit Judge:

This case arises out of a petition brought by the National Labor Relations Board (hereinafter, the Board) pursuant to Section 10(e) of the National Labor Relations Act, as amended, 29 U.S.C. § 151 et seq., (hereinafter, the Act), for the enforcement of two orders against the respondent, American Art Industries, Inc. (hereinafter, the Company). In the first proceedings before the Board, reported at 166 NLRB No. 109, the Board found that the Company had violated Section 8(a) (1) of the Act by coercively interrogating its employees, threatening to close its plant if a union was brought in, promising benefits to undermine the union's organizing drive, and threatening to discharge any employee who joined in a strike against the Company. The Board also found that the Company violated Section 8(a) (3) and (1) of the Act by discriminately discharging four employees because of their organizational activity on behalf of the union. Finally, the Board found that, since July 22, 1966, the Company has refused to recognize and bargain with the Union, General Sales Drivers and Allied Employees, Local No. 198, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, which represented a majority of its employees in an appropriate bargaining unit, in violation of Section 8(a) (5) and (1) of the Act. In the second proceeding before the Board, reported at 170 NLRB No. 70, the Board found that the Company had violated Section 8(a) (4) and (1) of the Act by discharging two employees because they had testified in behalf of the General Counsel in the prior proceeding.

Pursuant to these findings, the Board ordered the Company to cease and desist from the unfair labor practices found to have been committed and in any other manner interfering with, restraining, or coercing employees in the exercise of their rights under Section 7 of the Act. By way of affirmative action, the Board ordered the Company to bargain collectively with the Union as the exclusive representative of all employees in the bargaining unit upon request, to offer reinstatement to those striking employees who made an unconditional request for reinstatement, to reinstate the unlawfully discharged employees and make them whole for wages lost as a result of their having been discharged, and to post appropriate notices.

The facts of the case are as follows: On July 13, 1966, an employee of the Company, one Jesus Diaz, obtained approximately fifty authorization cards from the Union's representative in order to begin a union organizing drive at the Company's plant. Some of these cards were given to three other employees of the Company, Reverend J. D. Mosely, Carlos Paez, and Herman Gonzalez, who were also participating in the union organizing drive. On July 18th, the four organizers began making solicitations with the Company's employees for membership in the Union.

On July 19th, Joe Foster, the Company's vice-president, had conversations with three of the organizers at their work stations in the plant. In these conversations, Joe Foster inquired whether the organizers had "heard anything about the Union", and stated to each that if the union did come in, the plant would be closed.

During the lunchtime break on July 19th, Ted Foster, the president of the Company, had a conversation with about twelve of the Company's employees who were sitting on the ground outside the plant eating their lunch where he told them of his intention to install lunch facilities at the plant.

Jesus Diaz testified that later in the afternoon he overheard a conversation between Ted Foster and his brother Joe inside the plant to the effect that authorization cards had been given out and that the union organizers would be dismissed because the work was slow.[1] Shortly be-

1. According to Diaz, the conversation went as follows:

"Joe, I thought this was the beginning of everything, that they were do-

fore the close of the business day, the four organizers were told that business was slow and that the Company was being forced to close some departments and that they were being laid off.

On the following morning, the four organizers returned to the Company's parking lot to collect signed authorization cards from some employees and to distribute unsigned cards to others. The word spread that the four men had been dismissed and the employees began to congregate in the parking lot. Mr. and Mrs. Ted Foster then arrived at the plant and went over to the assembled employees. Mrs. Foster spoke to the employees and, although there is conflicting testimony as to her exact words, she said in substance that if they did not begin working by 8:00 a. m. they would be fired. The assembled employees responded to this by shouting that they wanted the union and then went to the union hall to take a vote, the purpose of which is unclear, and then returned to picket the plant, carrying signs which read: "Employees of American Art on strike because of unfair labor practices. Teamsters Union 198".

On July 21st, the Company invited all of the strikers including the four laid-off organizers, to return to work by posting notices at the plant and by sending each striker a copy of the notice by mail. The strike, however, continued until the first proceeding came before the Board in November of 1966.

On July 22nd, the Union made a written demand for recognition, claiming to represent a majority of the Company's production and maintenance employees, to which the Company replied, denying the Union's majority status and advised the Union to "use the facilities of the National Labor Relations Board to determine the rights of the parties".

In response to a Union application for reinstatement on behalf of thirty-six named employees, the Company, on No-

vember 7, 1966, made an unconditional offer to the employees to return to their old jobs. Two employees, J. D. Mosely and Horatio Trujillo, accepted the Company's offer and reported for work on the 15th and 16th of November, respectively. Both men were subpoenaed and testified as witnesses for the General Counsel a few days after resuming their work with the Company. When they reported for work after testifying, they were told that there was no work for them and that they would be called when any work became available. Neither of the men were called back to work.

The Company resists enforcement of the Board's orders on two main grounds: *first*, that the Company was denied a fair trial by the bias and prejudice of the trial examiner; and, *secondly*, that findings of the Board are not supported by substantial evidence on the record as a whole.

 The Company asserts in its brief several manifestations of the alleged bias and prejudice of the trial examiners in the two proceedings, but after careful consideration of the records in each proceeding, we cannot say

that the proceedings were characterized by fell expedition or determined purpose to reach a predetermined end, or were attended with suppressive and exclusionary rulings and actions, designed to prevent and preventing a fair hearing. Continental Box Company v. N. L. R. B., 5 Cir., 1940, 113 F.2d 93, 96.

On the contrary, we feel the two trial examiners' "conduct * * * comported with the high standards that a litigant has a right to expect under the Labor Act and under the Administrative Procedure Act." N. L. R. B. v. Transport Clearings, Inc., 5 Cir., 1962, 311 F.2d 519. The fact that the trial examiners and the Board generally credited the Board's witnesses and discredited those of the Company is not enough to establish

ing some talking, but they have given out the cards all over the place and we've got to get rid of them."

Then later in the conversation:
"We will say its quiet and it is slow." (App. 103).

that the hearing was unfair because of bias and prejudice. See N. L. R. B. v. Bush Hog, Inc., 5 Cir., 1968, 405 F.2d 755, 756. Likewise, a trial examiner has the right to examine and cross-examine witnesses in order that the facts are clearly and fully developed. N. L. R. B. v. Bryan Manufacturing Co., 7 Cir., 1952, 196 F.2d 477. Finally, it is not error for a trial examiner to take judicial notice of a prior proceeding before the Board involving the same parties as in the present action, as was done in the second proceeding. N. L. R. B. v. Reed & Prince Manufacturing Co., 1 Cir., 1953, 205 F.2d 131, 139–140. The Company's contention that Trial Examiners Ladwig and Kessel were biased and prejudiced against the Company is without merit.

■■ The Company, in support of its contention that the findings of the trial examiners and the Board were not supported by the substantial evidence in the record taken as a whole, argues that we should decline to follow the action of the trial examiner in crediting and discrediting the testimony of the various witnesses. A review of the record demonstrates that there was a substantial conflict in the evidence, with the version of the facts presented by the Company's witnesses directly conflicting with the version presented by the Board's witnesses. The trial examiner consequently was faced with the task of deciding which side's version to believe. Although in a proper case the Court may decline to follow the action of the examiner in crediting and discrediting testimony even though the Board has adopted the examiner's findings, N. L. R. B. v. Elias Brothers Big Boy, Inc., 6 Cir., 1964, 327 F.2d 421, 426, we are generally bound by the credibility choices made by the trial examiner. Nabors v. N. L. R. B., 5 Cir., 1963, 323 F.2d 686, accord N. L. R. B. v. Monroe Auto Equipment Co., 5 Cir., 1968, 392 F.2d 559, 560–561; N. L. R. B. v. Waycross Sportswear, Inc., 5 Cir., 1968, 391 F.2d 294. The Company relies heavily on inconsistencies in the testimony of the Board's witnesses on cross-examination by the Company's counsel, but these inconsistencies deal largely with collateral matters and do little more than demonstrate the fallibility of memory and well known difficulties in judicial proof. The trial examiner was faced with a substantial conflict in the evidence and resolved this conflict by generally crediting the Board's witnesses and discrediting the Company's witnesses. Even in the light of the inconsistencies as to collateral matters in the testimony of the Board's witnesses, we cannot say that for this reason the findings were not supported by the substantial evidence in the record taken as a whole.

■■ The Company argues that the interrogation of the three employee-organizers by the Company vice-president Joe Foster on July 18, 1966, was not a coercive interrogation as prohibited by Section 8(a) (1) of the Act. The Company rests its position on the case of Mel Croan Motors, Inc. v. N. L. R. B., 5 Cir., 1968, 395 F.2d 154, where the Court held that, in the absence of a background of employer hostility and discrimination, interrogation which did not appear to be seeking information on which to base reprisals and which was not in itself threatening did not violate Section 8(a) (1) of the Act.[2] However, the facts in the present situation are clearly distinguishable from the Mel Croan situation in that Joe Foster not only inquired as to whether the organizer-employees knew about the union organizing drive, but went on to threaten to close the plant if the union was brought in. The present situation is controlled by our decision in Reading & Bates, Inc. v. N. L. R. B., 5 Cir., 1968, 403 F.2d 9, where we held that when interrogation is accompanied by implied or express threats of reprisal the Board may conclude that the employer intended to interfere with his employee's right of self-organization in vio-

---

2. In *Mel Croan*, a supervisor asked "who started it and how it got started" upon being confronted by two employee representatives immediately after an employee meeting, which question they did not answer.

lation of Section 8(a) (1). See also N. L. R. B. v. Goodyear Tire & Rubber Company Retread Plant, 5 Cir., 1968, 394 F.2d 711, 712.

■■■■ We have carefully reviewed the transcript of the proceedings in this case and find that substantial evidence on the record as a whole in all other respects supports the Board's findings that the Company violated Section 8(a) (1) of the Act by coercively interrogating and threatening its employees (Reading & Bates, Inc., v. N. L. R. B., supra; N. L. R. B. v. Big Three Welding Equipment Co., 5 Cir., 1966, 359 F.2d 77, 79; and N. L. R. B. v. Almeida Bus Lines, Inc., 1 Cir., 1964, 333 F.2d 725, 729) and by promising benefits in an attempt to undermine the union organizing drive (N. L. R. B. v. Exchange Parts Co., 375 U.S. 405, 409, 84 S.Ct. 457, 11 L.Ed.2d 435 (1964), and N. L. R. B. v. Tidelands Marine Service, Inc., 5 Cir., 1964, 339 F.2d 291, 293); that the Company violated Section 8(a) (3) and (1) of the Act by discharging four of its employees because they engaged in union activity (N. L. R. B. v. Dell, 5 Cir., 1960, 283 F.2d 733, 736); that the Company violated Section 8(a) (4) and (1) of the Act by discharging two of its employees because they testified at a Board hearing (N. L. R. B. v. American Pad & Textile Co., 5 Cir., 1966, 357 F.2d 742, and N. L. R. B. v. R. C. Can Co., 5 Cir., 1965, 340 F.2d 433, 434). The Board's finding that the Company violated Section 8(a) (5) and (1) of the Act by refusing to recognize and bargain with the Union will be discussed below.

In considering the correctness of the bargaining order issued by the Board in this case, we face the initial question of whether the finding that the Union represented a majority of the Company's employees is supported by the substantial evidence in the record taken as a whole. This question further breaks down into two specific issues: *first,* whether the authorization cards signed by the Company's Spanish-speaking employees were valid; and, *secondly,* whether the trial examiner had sufficient evidence to find that the Company employed a total of forty-three employees at the time of the bargaining demand in light of the fact that the trial examiner excluded all evidence offered by the Company going to the size of the bargaining unit at the time the Union's demand was made because of the Company's refusal to produce subpoenaed employee-earning records while the General Counsel was making his case.

The first of these issues requires a reconsideration of our decision N. L. R. B. v. Texas Electric Cooperatives Inc., 5 Cir., 1968, 398 F.2d 722, in light of the recent Supreme Court decision of N. L. R. B. v. Gissel Packing Co., 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547, 1969. Eleven of the thirty-five employees who signed authorization cards spoke only Spanish and were unable to understand either written or spoken English. The Company attacks the validity of the authorization cards signed by these employees on the ground that there was no showing that they understood what consequences would flow from the act of signing the cards. In so doing, the Company relies on N. L. R. B. v. Texas Electric Cooperatives, Inc., supra, which dealt with a situation where several of the employees who had signed authorization cards were illiterate and the authorization cards were not read to them when they signed. There the Court held that when the employer introduces evidence to indicate that its employees did not understand what they were signing, the Board must establish by a preponderance of the evidence that the signer of the card did, in effect, what he would have done by voting for the union in an election. The Court further held that the trial examiner applied an erroneous standard to the facts by precluding a probe into the *subjective intent* of the challenged signers.

Our decision in *Texas Electric* in turn relies on N. L. R. B. v. Southland Paint Company, 5 Cir., 1968, 394 F.2d 717, and a long line of cases. See, e. g., Engineers & Fabricators, Inc. v. N. L. R. B., 5 Cir., 1967, 376 F.2d 482, and N. L. R. B. v.

Peterson Bros., Inc., 5 Cir., 1965, 342 F.2d 221, rejecting the Board's *Cumberland Shoe* doctrine, 144 NLRB 1263 (1963), enforced 6 Cir., 1965, 351 F.2d 917. The National Labor Relations Board took the position in *Cumberland Shoe* that if the authorization card is itself unambiguous, that is, if the card states on its face that the signer authorizes the union to represent the employee for collective bargaining purposes and not to seek an election, it will be counted without any inquiry into what the subjective intent or understanding of the employee was in signing unless it is proved that the employee was told that the card was to be used solely for the purposes of obtaining an election. In rejecting the *Cumberland Shoe* doctrine, we took the position that when cards are challenged because of alleged misrepresentations in their procurement, the burden is on the General Counsel to probe into the subjective intent of the signers and show that it was their intent to authorize union representation. Engineers & Fabricators, Inc. v. N. L. R. B., supra, 376 F.2d at 487.

In N. L. R. B. v. Gissel Packing Co., supra, the Supreme Court adopted the *Cumberland Shoe* doctrine and thereby overruled the position we had previously taken. See N. L. R. B. v. American Cable Systems, Inc., 5 Cir., 1969, 414 F.2d 661. In the light of these decisions, we find that since the authorization cards were unambiguous on their face and that at no time was an employee told that the cards were to be used solely for obtaining an election, they were valid and properly counted in determining whether the Union represented a majority of the Company's employees when the bargaining demand was made, and the fact that the eleven employees were Spanish speaking was irrelevant. Accordingly, there was no error in the trial examiner's refusal to allow the Company's counsel to "probe into the subjective intent" of the employees in signing the authorization cards.

The Company contends that the trial examiner committed error by refusing to admit any evidence offered by the Company which would go toward proving the total number of employees on the Company's payroll when the bargaining demand was made. We hold that the trial examiner in no way abused his discretion in excluding this evidence, and that the trial examiner's finding that the Union represented a majority of the Company's employees on the date of the demand is supported by the substantial evidence taken as a whole. The General Counsel caused a subpoena duces tecum to issue for the production of the employee-earnings records kept by the Company for the week of July 19, 1966, and for two months preceding. The Company's motion to quash the subpoena was denied. Nevertheless, the Company refused to produce the subpoenaed records on the ground that they would tend to incriminate the president of the Company who was under a criminal charge arising out of the labor unrest at the Company's plant. No attempt to enforce the subpoena was made under Section 11 of the Act. See 29 U.S.C. § 161(2) (1965). However, in the presentation of its own case, the Company attempted to introduce what it alleged to be the time cards punched by its employees for the week of July 19, 1966, and other testimony going to the size of the bargaining unit. This evidence was excluded under the *Bannon Mills* doctrine, 146 NLRB 611 (1964), on the ground that business records of the Company, which would have conclusively established the size of the bargaining unit, had been subpoenaed by the General Counsel and because of the Company's refusal to produce these records, the General Counsel had been required to establish the size of the bargaining unit through secondary evidence.

It is elementary that an officer of a corporation cannot assert his privilege against self-incrimination under the Fifth Amendment to the Constitution to prevent the production of the books and records of the corporation of which he is an officer. See United States v. White, 322 U.S. 694, 700–701, 64 S.Ct. 1248, 88 L.Ed. 1542 (1944). Thus, the Com-

pany's contention that the earning records of its employees were inadmissible because they would tend to incriminate the president of the Company is without merit.

■ The Board, on the other hand, argues that the earning records of the Company's employees were the best evidence available to prove the number of employees in the bargaining unit (see Sylvania Electric Products, Inc. v. Flanagan, 1 Cir., 1965, 352 F.2d 1005, 1007–1008, and N. L. R. B. v. International Union of Operating Engineers, Local 12, 9 Cir., 1957, 243 F.2d 134) and that since the Company had deliberately withheld this evidence from the General Counsel in the face of a subpoena duces tecum issued by the Board under Section 11 of the Act, it should not be allowed to later produce evidence of a secondary nature to prove what could have been conclusively established if the subpoena had been honored. *Bannon Mills, Inc.*, supra, at 613. We agree. Once the Company refused to honor the subpoena duces tecum and thereby made it necessary for the General Counsel to establish the size of the bargaining unit through secondary evidence, it would have been inequitable to allow the Company to contradict this evidence with more secondary evidence while the Company, at all times, had in its possession the subpoenaed earning records which would have been conclusive and refused to produce them. In order to maintain the integrity of the hearing process, the trial examiner had, under the circumstances, little choice but to refuse to admit the secondary evidence as to the alleged size of the bargaining unit proffered by the Company in the presentation of its case.

We therefore find that the Board's finding that the Union represented the majority of the employees in the appropriate bargaining unit is supported by the substantial evidence in the record taken as a whole.

The last major issue we face is the propriety of the bargaining order issued by the Board as a remedy for the Company's refusal to bargain with the Union in violation of Section 8(a) (5) of the Act. This matter is controlled by the recent Supreme Court decision of N. L. R. B. v. Gissel Packing Company, supra, and the Fifth Circuit Court's decision in N. L. R. B. v. American Cable System, supra. Under these decisions, we are constrained to deny enforcement of the order to enter collective bargaining and remand for further findings.

The Board found that the Company's independent unfair labor practices in violation of Section 8(a) (1) and (3) demonstrated that the Company's refusal to bargain with the Union on the basis of authorization cards was not motivated by a "good faith doubt" as to the Union's majority status. This finding led the Board to the conclusion that the Company's refusal to bargain was in violation of Section 8(a) (5) and (1) and that a bargaining order was the appropriate remedy.

■ Under the *Gissel* and *American Cable* decisions, the Board may issue a bargaining order where a union had valid authorization cards from a majority of the employees in an appropriate unit and where the Company's unfair labor practices were serious enough to "have the tendency to undermine majority strength and impede the election processes". *Gissel*, supra, 395 U.S. at 614, 89 S.Ct. at 1940, 23 L.Ed.2d at 578. Before determining that a bargaining order is the appropriate remedy, however, the Board must "take into consideration the extensiveness of an employer's unfair practices in terms of their past effect on election conditions and the likelihood of their recurrence in the future". *Id.* In *American Cable* this Court held that the Board, prior to issuing a bargaining order, must find that:

"(a) the union had valid authorization cards from a majority of the employees in an appropriate bargaining unit; (b) the employer's unfair labor practices, although not 'outrageous' and 'pervasive' enough to justify a bargaining order in the absence of a card majority, were still serious and extensive; (c) 'the possibility of erasing

the effects of past practices and of ensuring a fair election (or a fair rerun) by the use of traditional remedies, though present, is slight'; and (d) employee sentiment can best be protected in the particular case by a bargaining order."

Since the Board made no findings on these points and since it is not appropriate for this Court to make such findings, we remand the case to the Board for further adjudication.

The Board's order as far as it concerns American Art Industries' violations of Sections 8(a) (1), (3) and (4) is enforced. As to the Board's bargaining order and the underlying findings of a Section 8(a) (5) violation, enforcement is denied and the case is remanded for further findings.