**MORGAN PRECISION PARTS,**
Petitioner-Cross Respondent,

v.

**NATIONAL LABOR RELATIONS BOARD,** Respondent-Cross-Petitioner.

No. 30234.

United States Court of Appeals, Fifth Circuit.

July 15, 1971.

A. H. Gaede, Jr., John J. Coleman, Jr., Birmingham, Ala., Bradley, Arant, Rose & White, Birmingham, Ala., of counsel, for petitioner.

Marcel Mallet-Prevost, Asst. Gen. Counsel, N.L.R.B., Washington, D. C., Walter C. Phillips, Atlanta, Ga., Allen H.

Feldman, Atty., Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Elliott Moore, Atty., N.L.R.B., Washington, D. C., for respondent.

Before WISDOM, Circuit Judge, DAVIS *, Judge, and GOLDBERG, Circuit Judge.

DAVIS, Judge:

The National Labor Relations Board, adopting its trial examiner's report, entered an order against Morgan Precision Parts, finding violations of sections 8(a) (1) and 8(a) (3) of the National Labor Relations Act, 29 U.S.C. § 151 et seq. (1964) 183 NLRB No. 119 (June 25, 1970). The company seeks review and rejection of the order (in largest part); the Board has cross-petitioned for enforcement. It is agreed that this court and the Board have proper jurisdiction and authority over the company and the proceedings.

Morgan Precision Parts is located, and has its factory, in Gadsden, Alabama. It is a relatively small business, employing some 30 to 50 workers—mainly women, with about five male employees—and is wholly owned by William Morgan (called Billy in this record) who manages and controls it in person, and supervises the day-to-day operations. The plant is engaged in the assembly and sale of weaponry fuse mechanisms, and the work involves the operation of machines as well as hand labor. Prior to the middle of October 1969, there was apparently no or very little union activity. On the morning of October 14, 1969, Billy Morgan received a letter from the Retail, Wholesale and Department Store Union, Local 506, AFL–CIO, claiming that it had majority status. Mr. Morgan, upset and disturbed over this possibility, then made a speech to the employees about the union's effort, and also gave at least one other talk on that subject a few days later. These and the other events which

the Board found to violate the Act, occurring on October 14th and in the following week or so, will be detailed, so far as necessary, in our discussion of the specific charges.

■ *Section 8(a) (1) charge:* The Board determined that Morgan Precision violated section 8(a) (1) by interfering with, restraining and coercing its employees in the exercise of their rights under section 7. At the hearing the company stipulated, and does not now contest, that in his speeches Billy Morgan threatened he would close the plant and reduce substantial employee benefits if the operation were unionized; it was also stipulated that the company engaged in surveillance of employees while they were giving testimony to a Board agent investigating the union's charge. These actions are conceded to violate section 8(a) (1). But the employer does challenge (in addition to the discriminatory discharge discussed *infra*) one minor aspect of the finding of infringement of section 8(a) (1)—that the company, following the receipt of the union letter on October 14th and Mr. Morgan's talk to the employees on that day, did not replenish candy customarily left on a shelf in the "break room" for the workers to buy,[1] cut off the supply of facial tissue which had previously been available, and required employees to ask for Bufferin and sanitary napkins at the front office instead of placing them (as before) where the employees could buy them from machines or help themselves. The Board (accepting the examiner's opinion) found that, in the context of Billy Morgan's expressed opposition to the union, and his threat to take away benefits, and in the absence of any acceptable explanation of the changes, the company took this action "because employees had displayed interest in unionization. While the deprivations thus imposed by [the company] may have

---

* Honorable Oscar H. Davis, U. S. Court of Claims, Washington, D. C., sitting by designation.

1. There is also a finding that "employees could purchase candy and gum outside the plant but would have to spend their entire break periods making such purchases."

been relatively mild, the notice they served was by no means mild. Even standing alone they pointedly told the employees that before they took the step of organizing, they should bear in mind that 'the employer gives and the employer takes away' "—"serv[ing] as earnest of the threats made in [the] speech" of October 14th. These factual findings are adequately supported by substantial evidence, and the Board could properly consider, for the reasons it gave, that it should not view the curtailing of these lesser benefits in isolation or as *de minimis.* Cf. N.L.R.B. v. My Store, Inc., 345 F.2d 494, 497 (C.A. 7), cert. denied, 382 U.S. 927, 86 S.Ct. 315, 15 L.Ed.2d 340 (1965).

■ *Section 8(a) (3) charge:* The principal issue concerns the discharge of Mrs. Betty Mansfield, which the Board held to be discretionary in violation of section 8(a) (3) of the Act.[2] At the close of work on October 14, 1969—after Billy Morgan had received the union's letter and had given (in the morning) his first anti-union talk—he discharged Mrs. Mansfield. The Board found that this came about because he knew she was a union adherent and had engaged in activities on its behalf. The company claims that, though Morgan actually fired Mrs. Mansfield in the afternoon of October 14th, he had already made his decision early in the morning of that day before he had gotten the disturbing union communication and at a time when he did not know of any union connections on her part—and that he acted solely because she was a poor worker, with an unsatisfactory attitude to her job, who was reaching the end of her 90-day probationary period without showing adequate promise of acceptable performance.

This is, of course, not an unfamiliar type of factual dispute in Labor Board cases, but the company insists that here the administrative determination cannot stand because there was direct testimony by company witnesses squarely supporting its position, and no evidence produced by the General Counsel directly showing Billy Morgan's knowledge of Mrs. Mansfield's union connection or activity, and no evidence directly contradicting his evaluation of her work or directly controverting the company's version of the timing of the dismissal.

Mrs. Mansfield had previously worked for Morgan Precision Parts but had been laid off, with others, for lack of work. She was rehired on July 18, 1969, subject to the usual 90-day probationary period. As to her dismissal in October, Billy Morgan testified, with the corroboration of his secretary (Mrs. Peggy Moon): during this probationary period he criticized Mrs. Mansfield's work on occasion and suggested improvements; he was not satisfied with her work or job-attitude; on Thursday, October 9th, he and Mrs. Moon considered when Mrs. Mansfield's probation would expire and he asked to see her production record, which indicated that she had never "made production" for any week (i. e. produced as many items as were called for in the company's production schedules); between that time and Tuesday, October 14th, he made up his mind to fire her for poor performance; early in the morning of October 14th, before the receipt of the organizing letter, he directed Mrs. Moon to prepare a termination notice for Mrs. Mansfield because that was the latter's 89th day; and she was given the notice at the close of that working day, with an explanation of the reasons for the discharge. The trial examiner's opinion says, however, that he "was unfavorably impressed by Moon and Morgan with respect to credibility and does not credit their testimony that Mansfield's employment record was checked, or that her possible discharge was under consideration, prior to October 14. The trial examiner also does not credit their testimony as to when Morgan ordered the termination papers prepared."

---

**2.** The discharge was also held to violate section 8(a) (1).

The other crucial segment of testimony relates to an event during the 2 p. m. "break" in the afternoon of October 14th. At the end of his anti-union speech that morning Morgan told the "stakers" (women who worked on the staking machines) to punch-out on the time clock and go home. They did leave but told Mrs. Mansfield (who was not then a staker), as well as some others, that they were going to the union hall. The remaining female workers discussed among themselves whether they should also leave. At the 2 p. m. break, Mrs. Mansfield telephoned (from the phone in the break area) one of the laid-off stakers at her home, and asked what the union organizer had said. After finishing her call, Mrs. Mansfield went up to a nearby table in the break area at which other women employees were sitting and, in response to a question, told them that the laid-off worker had gone to the union hall, the organizer said they all should stick together, and those still at the plant should continue working and go to the union hall at the end of the day. There was testimony by the women present at the time that Charles Morgan, Billy Morgan's son and an employee, together with another male employee, were present in or very near the break area during this episode, that Charles Morgan used the slot machine to buy a soft drink, passing extremely close to Mrs. Mansfield when she was reporting her phone call, and that the witnesses thought it possible for him to overhear (though they did not know whether he had in fact done so). Charles Morgan did not recall whether or not he was in the area at that time, but he flatly denied having over-

heard the report of the phone call or the conversation at the table. The examiner says that he "is convinced that the three [women] employees did not contrive or imagine the incident and credits their testimony and does not credit Charles Morgan's denials. It is found that Charles Morgan heard enough of what Mansfield said after the telephone conversation to make him aware that she was relaying to the other employees matter concerning the employees' efforts at unionization."[3] (Charles Morgan admitted that if he had overheard union talk he would have reported it to his father.)

Having examined the full transcript, we see no reason to overturn the examiner's appraisal of credibility, or his findings with respect to (a) when Billy Morgan decided to fire Mrs. Mansfield, (b) his knowledge of her union connections when he made that decision, or (c) the true grounds of the dismissal. The written record of the testimony of the two Morgans and Mrs. Moon (the secretary) does not carry on its pages such an invincible stamp of truth that we can say the examiner was arbitrary in rejecting its critical parts; conversely, the evidence of Mrs. Mansfield and her colleagues does not seem so weak, shoddy, or fabricated that it had to be rejected. See Pittsburgh S. S. Co. v. N.L.R.B., 337 U.S. 656, 659–60, 69 S.Ct. 1283, 1285, 93 L.Ed. 1602, 1606 (1949). Moreover, there is considerable evidence in the rest of the record detracting from the recital of events presented in the company's testimony (cf. Bon Hennings Logging Co. v. N.L.R.B., 308 F.2d 548, 554 (C.A. 9, 1962)),[4] and Billy Morgan's opposition

3. At another point in his opinion, the examiner said (after remarking on the tenseness in the plant on October 14th) : "Morgan's son plainly was especially interested, and he could not have failed to notice the scene where Mansfield, after her telephone call, walked over to her friends and, from the far end of their table, relayed the instructions of their union organizer. In that situation he did not have to hear much of what she said, as he passed immediately behind her and then stood at

the drink machine nearby, in order for him to realize that she was the conveyor of a message about the employees' union activities, and that his father would be most interested."

4. For instance, Mrs. Mansfield was not a good worker during her previous period with the company, but was explicitly not laid off for that reason; during the employment from which she was fired in October 1969, she was never warned that her job was in danger, although her work

to the union was clear, as was his anger over the organizational activity which had surfaced on October 14th. With the rejection of the company's version, the adverse inferences the examiner and the Board drew are neither far-fetched nor unreasonable, but are within the administrative province. They are not the product of "mere suspicion", as the company insists, but are rooted in substantial evidence in the whole record.

True, it is a *sine qua non* to liability that Billy Morgan know of Mrs. Mansfield's relation to the union, but there need not be direct evidence of such knowledge; it can be inferred, as here, from circumstantial evidence. Texas Aluminum Co. v. N.L.R.B., 435 F.2d 917, 919 (C.A. 5, 1970). Likewise settled is the rule that a Labor Board determination is not invalidated simply because the examiner refuses to believe the significant aspects of the employer's testimony. N.L.R.B. v. American Art Industries, Inc., 415 F.2d 1223, 1226–1227 (C.A. 5, 1969), cert. denied, 397 U.S. 990, 90 S.Ct. 1122, 25 L.Ed.2d 397 (1970). And though the company argues that the examiner imposed on the employer the burden of disproving its discriminatory animus, the opinion reveals no hint of such a reversal of the normal burden. We add, too, because a companion charge of bias is laid against the examiner, that the record reflects no ground whatever for that complaint. See N.L.R.B. v. American Art Industries, supra, 415 F.2d at 1226–1227.

*Denial of pre-hearing discovery:* Another of the employer's arguments is that the Board wrongly denied motions for pre-hearing production of statements given to the Board by persons whom the General Counsel intended to call as his witnesses, and also for the right to take pre-hearing depositions of designated individuals whom the Board was likely to use. In N.L.R.B. v. Schill Steel Products, Inc., 408 F.2d 803 (C.A. 5, 1969), a civil contempt proceeding instituted here by the Board, the court, over the Board's objection, allowed discovery, prior to a hearing before a special master appointed by the court, of statements taken from the Board's intended witnesses relating to the alleged contempt. We do not have to consider or decide, in the current case, whether the rule of *Schill Steel Products* is, or should be, applicable to proceedings before the Board itself (as distinct from the scope of discovery in court proceedings),[5] because, in any event, an error of this character could not overturn a Board decision unless there were substantial prejudice to the challenging party. N.L.R.B. v. Safway Steel Scaffolds Company of Georgia, 383 F.2d 273, 276–77 (C.A. 5, 1967), cert denied, 390 U.S. 995,

was criticized on occasion; she seems to have made production, at times, on a daily basis although not for a full week; Billy Morgan called it a company rule to discharge women who did not "make production" within the 90-day probation period, but apparently no other worker was ever discharged on that ground and exceptions were always made; in any event, the policy was to allow the employee 90-days on a particular job or machine, but when Mrs. Mansfield was discharged she had been on a job tied to a production schedule for only 75-80 days, having spent the rest of her 89 days of employment on work which did not have such a schedule; she was summarily fired on her 89th day, in the middle of a pay period, although there was no rule or practice to prevent Morgan from discharging her on the 90th or any later day if he wished, or at the end of the pay period; there was even a sharp discrepancy between employer witnesses as to whether the 90-day probationary period covered only working days or all calendar days. The record is far from compelling (in the company's favor) on the nature, strictness, or mandatory character of the so-called 90-day probationary period, and on the practice under it.

5. *Cf.* N.L.R.B. v. Schill Steel Products, *supra*, 408 F.2d at 808; N.L.R.B. v. Golden Age Beverage Co., 415 F.2d 26, 34–35 (C.A. 5, 1969); N.L.R.B. v. Miami Coca-Cola Bottling Co., 403 F.2d 994, 996 (C.A. 5, 1968); N.L.R.B. v. Safway Steel Scaffolds Co. of Georgia, 383 F.2d 273, 276–77 (C.A. 5, 1967), cert. denied, 390 U.S. 955, 88 S.Ct. 1052, 19 L.Ed.2d 1150 (1968); N.L.R.B. v. Interboro Contractors, Inc., 432 F.2d 854 (C.A. 2, 1970), cert. denied, 402 U.S. 915, 91 S.Ct. 1375, 28 L.Ed.2d 661 (1971).

88 S.Ct. 1052, 19 L.Ed.2d 1150 (1968). We find no such prejudice in this instance.

The company has not shown any specific detriment from the Board's refusal of pre-trial discovery, and its claims of prejudice are all overly general, undocumented, and unsupported. The actual witnesses' prehearing affidavits were made available before cross-examination under the Board's rule,[6] and ample opportunity for cross-examination was given and used. Rebuttal witnesses were offered by the company, and its version of the contested events was fully explored. We know of nothing additional, and the employer suggests nothing, that could or might have been brought out if the requested discovery had been ordered. Moreover, a substantial part of the pre-hearing statements were irrelevant to the matters disputed at the hearing or relied upon by the Board in its findings and determination. In a word, the claim of procedural error is "technical" rather than substantial or material. As this court has said, "where a trial is conducted properly and all evidence is heard, the failure of the trial judge to allow discovery will not amount to prejudicial error." N.L.R.B. v. Safway Steel Scaffolds Company of Georgia, *supra,* 383 F.2d at 277.

■ *Scope of the order:* Finally, Morgan Precision objects to the general provision, in paragraphs 1(d) and 1(f) of the Board's order, referring to interference with the employees' rights "in any other manner", *i. e.,* other than those specifically adjudged in this proceeding. The contention is that this is the company's first Labor Act proceeding, and it has not shown any general proclivity to violate the Act. Cf. Mel Croan Motors, Inc. v. N.L.R.B., 395 F.2d 154, 156 (C.A. 5, 1968). But the Board was within its discretion to conclude on this record that the range and intensity of Billy Morgan's proven anti-union activity and bias—a

discriminatory discharge, threats to withhold benefits and to move his plant, surveillance of employees giving evidence to the Board—was sufficiently great that a broad order was appropriate. *See* N.L.R.B. v. Moore Dry Kiln Co., 320 F.2d 30, 34–35 (C.A. 5, 1963).

The petition for review is denied and the Board's order is enforced.

---

6. The company claims a failure to turn over the complete texts of certain statements, but if there was any failure to follow the Board's rule in this respect (*cf.* N.L.R.B. v. Borden Company, 392 F.2d 412, 416–417 (C.A. 5, 1968)—an issue we do not decide—the error, if any, was wholly immaterial in the context of this case.