## MATTER OF KODEN

### In Disbarment Proceedings Under 8 CFR 292.3

### A-18919327

*Decided by Board August 16, 1976 and August 30, 1974*
*Decided by Deputy Attorney General July 22, 1976*

(1) The term "accredited representative" as defined in 8 CFR 292.1(a)(4) includes any person who has been accredited as a representative of a recognized organization as defined in 8 CFR 292.2(a), whether he is an attorney or not. The determinative question is not whether the individual is an attorney, but is whether the individual is accredited by the Board as the organization's representative.

(2) There is no constitutional impediment to the Service disciplining an attorney who practices before it. Section 103 of the Immigration and Nationality Act (8 U.S.C. 1103) provides ample statutory authority to promulgate regulations implementing section 292 of the Act so as to provide appropriate regulations for institution of disciplinary proceedings against members of the agency's bar for unethical conduct. An administrative body may regulate, supervise, and discipline those who practice before it in the same manner as may a court.

(3) Where the charges allege the willful commission of acts respondent should have known were wrong, and where those charges were properly brought against respondent, section 558(c) of the Administrative Procedure Act (5 U.S.C. 558(c)) does not shield respondent from responsibility for any of the alleged acts of misconduct regardless of whether he had actual knowledge that the acts were proscribed by 8 CFR 292.3(a).

(4) Any acts of misconduct in disbarment proceedings brought under 8 CFR 292.3 must be established by evidence that is clear, convincing and unequivocal before discipline may be imposed.

(5) Depending on its probative value, circumstantial evidence alone may be sufficient to prove a charge in disbarment cases.

(6) Hearsay evidence is admissible in a disciplinary proceeding. Its admissibility is not so much predicated on administrative expertise as on the ability of an administrative tribunal properly to discern the probative force of all the evidence before it. It is proper for an administrative adjudicator to admit any relevant evidence, and then accord appropriate weight to that evidence after the record has been made.

(7) Where respondent was afforded ample opportunity to cross examine witnesses against him, the evidence was fully disclosed, and he was not denied a reasonable opportunity to defend on the charges levied in the complaint, denial of certain discovery motions, while perhaps unconvenient to respondent, was not prejudicial to him.

(8) The allegation that respondent wilfully misled and deceived an alien by purporting to represent her for a $550 fee when in fact he did not do so, in violation of 8 CFR 292.3(a)(4), is substantiated by clear, convincing and unequivocal evidence and discipline may be imposed upon respondent for that violation.

739

(9) Where the alleged "runner" Angulo, was unavailable at the time of the hearing, it was proper for the Board to draw inferences from the testimony of Witness Perez concerning her dealings with Angulo and conclude that a relationship of an unethical nature existed between Angulo and Respondent. The Perez testimony was not hearsay (see Rule 801(c) of the Federal Rules of Evidence) inasmuch as Angulo's assertion is not offered to prove the truth of the matter asserted but was offered for the inference to be drawn from the fact that the offer to engage in the client referral scheme was made at all. Under the circumstances the charge that respondent violated 8 CFR 292.3(a)(5) by employing a "runner" to solicit clients was properly sustained, and discipline may be imposed upon respondent for that violation.

(10) Order entered suspending respondent from practicing before the Service and Board for a period of one year based on six months suspension for each offense.

(CHARGES: 8 CFR 292.3(a)(1), (3), (4), (5), and (6)

ON BEHALF OF RESPONDENT:
Donald M. Leibsker, Esquire
Edward N. Morris, Esquire
Heidelberger, Leibsker and
    Gallagher
29 South LaSalle Street
Chicago, Illinois 60607

ON BEHALF OF SERVICE:
Irving A. Appleman
Appellate Trial Attorney

BEFORE THE BOARD
(August 16, 1976)

In our decision dated August 30, 1974, we ordered the suspension of the respondent from the practice of law before the Immigration and Naturalization Service and before us for a period of one year. We further, ordered that the record be certified to the Attorney General for final disposition, and stayed the suspension order pending such disposition. On November 22, 1974, we denied the respondent's petition for reconsideration of our decision of August 30, 1974. On the same date, the record was transmitted for review to the Attorney General pursuant to 8 CFR 292.3(b).

On July 22, 1976, the Deputy Attorney General [1] ordered the suspension of the respondent as an attorney before the Service and this Board for the period of one year from the date of our service on him of the Deputy Attorney General's decision (a copy of that decision was mailed to respondent's counsel on July 29, 1976). The Deputy Attorney General further ordered that the proceeding be remanded to us for further consideration consistent with his opinion of the charge that respondent violated 8 CFR 292.3(a)(1).

The Deputy Attorney General affirmed our findings that the respon-

---

[1] The Attorney General disqualified himself in this matter. The Deputy Attorney General has acted in this case pursuant to the provisions of 28 U.S.C. Section 508(a). See also 28 CFR 0.15(b).

dent, in violation of 8 CFR 292.3(a)(4), willfully misled and deceived an alien by purporting to represent her for a fee whereas in fact he did not do so; and that the respondent, in violation of 8 CFR 292.3(a)(5), unethically solicited practice by entering into a client referral arrangement with one Mr. Angulo, and thereby placing Mr. Angulo in a position which encouraged him to solicit clients for the respondent for monetary compensation in furtherance of that arrangement.

With respect to the charge that respondent violated 8 CFR 292.3(a)(1),[2] we concluded that the term "accredited representative" did not extend to an individual who qualifies as an "attorney" within the meaning of 8 CFR 1.1(f). Accordingly, we held that the respondent, who qualifies as an "attorney", was not properly charged with a breach of ethics by the first allegation in the complaint. By his decision of July 22, 1976, the Deputy Attorney General interpreted the term "accredited representative" to include any person who has been "accredited" as a representative of a recognized organization whether he is an attorney or not. The Deputy Attorney General pointed out that as to the charge that the respondent violated 8 CFR 292.3(a)(1), the crucial question is not whether the respondent was an attorney, but whether he was "accredited" by this Board as his organization's representative. We note, as did the Deputy Attorney General, that the record of this case does not indicate whether the respondent has been accredited. Further, we recently conducted an examination of our records and are unable to find that the respondent was accredited by us.

In accordance with the decision of the Deputy Attorney General (a copy is attached hereto), we shall suspend the respondent from practice before the Service and this Board for the period of one year, effective from the date of this order. Further, we shall remand the record to the Regional Commissioner for appropriate proceedings to ascertain whether the respondent was in fact accredited as a representative of a recognized organization under Part 292 of the Code of Federal Regulations.

* ORDER: The respondent is suspended from practice before the Immigration and Naturalization Service and the Board of Immigration Appeals for the period of one year, effective from the date of this order.

*Further order:* The record is remanded for further proceedings in accordance with the above opinion.

---

[2] Section 292.3(a)(1) provides in pertinent part that the Board, with the approval of the Attorney General, may suspend or bar from further practice an accredited representative of a recognized organization who charges or receives either directly or indirectly any fee or compensation for services rendered to any person, except that an accredited representative of such an organization may be regularly compensated by the organization of which he is an accredited representative.

* Board Member Irving A. Appleman abstained from consideration of this case

### BEFORE THE DEPUTY ATTORNEY GENERAL
#### (July 22, 1976)

This matter is before me for review pursuant to section 292.3(b) of Title 8 of the Code of Federal Regulations relating to the suspension or disbarment of attorneys and representative of accredited organizations from practice before the Immigration and Naturalization Service and the Board of Immigration Appeals.* Respondent is an attorney and was employed by the Travelers Aid Society of Metropolitan Chicago incorporating the Immigrants' Service League (hereafter referred to as the League). He was employed by the League to advise and represent its clients in connection with their immigration problems.

The Service commenced a proceeding under 8 CFR § 292.3(a) seeking the disbarment of respondent on a number of the grounds specified therein. After an evidentiary hearing before a representative of the appropriate regional commissioner of the Service, the commissioner forwarded the record to the Board, as required by the regulations, with the recommendation that respondent should be disbarred. The Board, by majority vote, sustained two of the changes and rejected the others; it ordered respondent's suspension from practice for a period of one year. Under the regulations, a suspension or disbarment order must be referred to the Attorney General for final determination.

Respondent, who was represented by counsel, raised a number of objections, some relating to the Board's constitutional and statutory authority to conduct the proceedings, others of a procedural nature, and still others cf an evidentiary nature. The Board, in a comprehensive opinion, rejected the constitutional, statutory, and procedural objections, and I conclude that it acted correctly.

It is appropriate at the outset to consider one charge rejected by the Board.[1] This charge alleged violation by the respondent of § 292.3(a)(1), which authorizes the suspension or disbarment in the public interest of an attorney who charges or receives grossly excessive fees and of an "accredited representative" who "charges or receives either directly or indirectly any fee or compensation for service, rendered to any person", except that such a representative may be regularly compensated by his organization. The Board reasoned that respondent as an attorney was not an "accredited representative" within the meaning of the regulation.

---

\* The Attorney General has disqualified himself in the matter. It is therefore before me pursuant to 28 U.S.C. § 508(a). See also 28 CFR § 0.15(b).

[1] The provisions of 8 CFR § 292.3(b) are ambiguous as to whether charges resolved by the Board in favor of an attorney are automatically subject to review by the Attorney General when a case is forwarded for his consideration as the result of an order of suspension by the Board based on other charges advanced in the same proceeding. The issue discussed below, however, is of sufficient importance to the administration of the immigration laws that I am considering this aspect of the case pursuant to my authority under 8 CFR § 3.1(h)(1)(i).

It regarded the purpose of the regulation solely as a means of preventing non-lawyers from entering the private practice of law. One member of the Board dissented, stating that "what would be improper conduct for a 'representative' if he is a layman [does not] . . . become proper conduct because he is also a lawyer." (Board Member Maniatis, dissenting, at 3.)

The term "accredited representative" is defined in 8 CFR § 292.1(a)(4), *as amended*, 40 F.R. 23271, May 29, 1975, as follows:

A person representing an organizaton described in § 292.2 of this chapter who has been accredited by the Board.

The process for accreditation of representatives is set out in 8 CFR § 292.2(d), *as amended*. Nothing in either secton cited above indicates that an attorney may not be "an accredited representative," or that if accredited, he would not be subject to the restrictions found in 8 CFR § 292.3(a)(1). Although these regulations were amended after the Board's decision in this case, the previous regulations defined "representative" as "a person representing a religious, charitable, social service, or similar organization established in the United States and recognized as such by the Board," 8 CFR § 1.1(j) (1975), and § 292.1(c) (1975) provided that a person could be represented by "an accredited representative of an organization described in section 1.1(j) of this chapter." Again accreditation procedures were provided in § 292.2(b) (1975). Thus under both the previous and present regulations, an "accredited representative" is "a person" who has been "accredited" by the Board. There is nothing in either set of regulations which would prevent the accreditation of attorneys or remove attorneys once accredited from the prohibitions contained in 8 CFR § 292.3(a)(1).[2]

The Board has cited no authority, either judicial or otherwise, to support its interpretation that an attorney cannot be an "accredited representative" as the term is used in the regulations, and I am aware of none. I conclude, moreover, that the Board's interpretation is not a reasonable one. I am not persuaded that the regulation was designed solely to prevent layman from practicing immigration law. I doubt that this is of direct concern to those charged with the administration of the immigration laws, but rather is a matter to be brought to the attention of the appropriate bar association for remedial action. See, for example, 7 Am. Jur. 2d. § 89. On the other hand, there exists a strong policy ground for a broader construction of the regulation. To permit a lawyer associated with an organization recognized by the Board to engage in the private practice of immigration law is susceptible of serious abuse. Aliens who apply to the organization for assistance often do so because they cannot afford a lawyer and do not know where else to turn. To the

---

[2] This section was not modified by the 1975 amendments.

extent outside practice by organization lawyers is allowed, such a lawyer is in a position to take advantage of his organization status in order to obtain business for himself that he could not otherwise secure. What should be a free or nominal rate service can be transformed into a full cost service. This record presents a vivid picture of the potential for confusion and oppression inherent in such an arrangement. On the other hand, to prohibit all attorneys providing services to recognized organizations from engaging in outside practice would have the effect of precluding an organization from obtaining outside legal advice unless it was prepared to pay a full-time salary. The regulations appear to me to balance these interests as follows: An attorney employed by a recognized organization need not be "accredited" in order to represent its clients. Such an attorney would then not be subject to the restrictions on "accredited representatives" appearing in § 292.3(a)(1). However, in order to avoid the potential for abuse of their status by lawyers closely associated with the organization, such as its full-time staff, an organization may choose, if the lawyer agrees, to seek his accreditation and thereby bring him within the restrictions upon outside practice provided by the regulations. Thus, in my view, the crucial question with respect to this charge is not whether respondent was an attorney, but whether he was "accredited" by the Board as his organization's representative. I cannot however, determine on this record whether respondent had been accredited or not. This aspect of the proceeding is therefore remanded to the Board for proceedings consistent with this opinion.

## II

The two charges sustained by the Board were, first, that in violation of § 292.3(a)(4) fo the regulations respondent willfully misled and deceived an alien by purporting to represent her for a fee whereas in fact he did not do so, and, second, that in violation of § 292.3(a)(5) he employed a "runner", one Mr. Angulo, to solicit clients. The first charge is amply sustained by the record, and, accordingly I affirm the Board's order directed to that charge.

As to the second charge, the only issue worthy of discussion concerns the testimony of one Bertha Perez. She testified that Angulo had offered to pay her $50 for every alien she would refer to respondent. Angulo himself was not available as a witness. The Board concluded that the inferences that could properly be drawn from the Perez testimony, together with other evidence, established the charge. Concerning this testimony the Board stated that while it was "not highly probative of whether she would in fact have been paid . . ., the mere fact that an offer of this nature was made to the witness strongly indicates that Mr. Angelo desired to induce the witness to refer aliens to the respondent" (BIA Op. 25).

It might be argued that the Perez testimony was inadmissible as hearsay. But, as the Board correctly noted (BIA Op. 8), it is not bound by the hearsay rule. Moreover, the testimony was not hearsay, as that term is generally understood, inasmuch as Angulo's assertion was not offered to prove the truth of the matter asserted. See Rule 801(c), Federal Rules of Evidence, 28 U.S.C. (Supp. IV), Appendix. The question was not whether Angulo would in fact have paid Perez for refereing clients to respondent, but whether a relationship of an unethical character existed between respondent and Angulo.[3] The evidentiary value of the statement arose not from reliance upon Angulo's truthfulness, but from an inference derived from the fact that an offer of this nature was made at all. Since there is no indication of an intent to communicate the proposition at issue, the danger of the declarant's insincerity in this regard, a primary factor in hearsay exclusion, is substantially reduced. See McCormick on Evidence (Cleary Ed. 1972) § 246 et. seq. It was thus, in my view, proper for the Board to consider such inferences as might arise from Perez' account of her dealings with Angulo. Accepting the propriety of such inferences, and having reviewed the other evidence relevant to this charge, I affirm the Board's finding.

Ordered that respondent be and he hereby is suspended from practice before the Immigration and Naturalization Service and the Board of Immigration Appeals for the period of one year from the date of service on him by the Board of this decision, and the proceeding is remanded to the Board for further consideration consistent with this opinion of the charge that respondent violated 8 CFR § 292.3(a)(1).

## BEFORE THE BOARD
### (August 30, 1974)

This case is before us pursuant to the provisions of 8 CFR 292.3(b). The respondent is an attorney who was admitted to the bar of the State of Missouri in 1966. In August of 1968, after having moved to Illinois, he commenced employment with a charitable organization located in Chicago. His new employer was the TRAVELERS AID SOCIETY OF METROPOLITAN CHICAGO Incorporating IMMIGRANTS' SERVICE LEAGUE (hereinafter referred to as the League).[1] The respondent's principal tasks while employed at the League involved advising and representing League clients in connection with their immigration

---

[3] Any inference that the offer was made to enhance Angulo's proper relationship with respondent as an interpreter is undermined by the fact that the offer to Perez was not limited to aliens in need of an interpreter's service.

---

[1] The IMMIGRANTS' SERVICE LEAGUE has been a recognized agency within the purview of 8 CFR 1.1(j) since 1958. Shortly before the respondent began working for the League, the TRAVELERS AID SOCIETY and the IMMIGRANTS' SERVICE LEAGUE merged.

problems. In January of 1971 the respondent resigned from his position at the League after it became known to his superiors that he was also representing aliens in a private capacity.

This disbarment proceeding was commenced on July 6, 1971, when the respondent was personally served both with a complaint, entitled Notice of Proposed Disbarment Proceedings, specifying the conduct which the Immigration and Naturalization Service alleged as grounds for discipline, and with a Notice to Show Cause why a motion seeking his disbarment should not be made to the Board of Immigration Appeals. The respondent answered the complaint by denying all the allegations of misconduct except one, which he neither admitted nor denied. The respondent also requested a hearing on the charges. On February 29, 1972, the Regional Commissioner for the Northwest Region of the Immigration and Naturalization Service forwarded notice to the respondent's counsel that the hearing was set for April 5, 1972, and that a presiding officer had been appointed to sit at the hearing. The hearing actually was commenced on April 19, 1972, after the Service had been granted a continuance, and was concluded on May 2, 1972. The Regional Commissioner has forwarded the entire record to us, together with his recommendation that the respondent be disbarred.

The respondent has challenged the propriety of these proceedings on several grounds. He initially contests the constitutional power of an administrative agency of the government to conduct disciplinary proceedings against an attorney. In support of this argument the respondent cites cases which stand for the proposition that the power to discipline an attorney is judicial in nature. However, an administrative body's regulation and supervision of those individuals who practice before it are not functionally different from the regulation and supervision of persons practicing before a court. Moreover, the Service seeks only to prevent the respondent from representing individuals before it and before this Board. The Service does not contend that the Attorney General or his delegates have any authority, in these proceedings, to limit the respondent's general practice of law. We perceive no constitutional impediment to these proceedings. See *Goldsmith* v. *United States Board of Tax Appeals*, 270 U.S. 117 (1926).

The respondent also maintains that there is an absence of statutory authority for this disbarment action. It is his position that any enabling legislation must contain a specific authorization relating to disciplinary actions if an administrative body is validly to regulate the members of its bar. This contention, however, does not find support in the case law. See *Goldsmith* v. *United States Board of Tax Appeals*, supra; *Herman* v. *Dulles*, 205 F.2d 715 (D.C. Cir. 1953); *Schwebel* v. *Orrick*, 153 F. Supp. 701 (D.D.C. 1957), affirmed on other grounds, 251 F.2d 919 (D.C. Cir. 1958), cert. denied, 356 U.S. 927 (1958). Consequently, the Attor-

ney General's power under section 103(a) of the Immigration and Nationality Act to "establish such regulations . . . as he deems necessary for carrying out his authority under the provisions of this Act" is an adequate basis upon which to predicate the regulations which govern this disciplinary action.

Moreover, it is unnecessary for us to rely solely on this implied power to regulate members of the immigration bar, since Congress has enacted more specific legislation in this regard. Section 292 of the Act grants to an individual in exclusion or deportation proceedings the right to be represented by any counsel of his choosing, "authorized to practice in such proceedings . . . ." The power to admit an individual to the bar of an administrative tribunal also includes the power to discipline that individual for unethical conduct. Cf. *In re Rhodes*, 370 F.2d 411 (C.A. 8, 1967), cert. denied, 386 U.S. 999 (1967). There is no lack of congressional authorization with respect to these proceedings.

The respondent further asserts that if the Act does permit disciplinary proceedings, these particular proceedings represent an unwarranted attempt to regulate activities which are of no direct concern to the Service. The respondent relies on *Mindel* v. *United States Civil Service Commission*, 312 F. Supp. 485 (N.D. Cal. 1970), to support his contention that the Service possesses no authority to institute disbarment proceedings against an attorney for conduct not occurring before the Service. *Mindel* is inapposite here. That case involved the discharge from employment of a postal clerk for his cohabitation with a woman not his wife. The court ruled that the discharge was improper, primarily because this private conduct, about which the parties had been discreet, in no way related to the individual's fitness as a postal clerk. The charges against the respondent, however, relate to the manner in which he conducted his professional practice, and consequently they have a direct bearing on his fitness as an attorney. The fact that the allegations against the respondent do not involve conduct *directly* before the Service does not prevent the Service from maintaining this action. *In re Carroll*, 416 F.2d 585 (C.A. 10, 1969), cert. denied, 396 U.S. 1011 (1970); see *In re Quimby*, 359 F.2d 257 (D.C. Cir. 1966).

The respondent's final challenge to the institution of these proceedings is based on 5 U.S.C. §558(c) (1970). This provision of the Administrative Procedure Act specifies that an administrative body may not, except in the case of willful conduct, institute proceedings to suspend or withdraw a license unless the affected party has first been given written notice of the alleged misconduct and has been given an opportunity to comply with all lawful requirements. The respondent relies heavily upon the decision in *Schwebel* v. *Orrick*, 153 F. Supp. 701 (D.D.C. 1957), affirmed on other grounds, 251 F.2d 919 (D.C. Cir. 1958), cert. denied, 356 U.S. 927 (1958). His position is supported to the extent that the

district court in *Schwebel* determined that an attorney's right to practice before an administrative agency was a license within the meaning of this provision. However, the *Schwebel* court also held that notice and an opportunity to correct the misconduct were not a prerequisite to those disciplinary proceedings, because the allegations against the attorney in that case were for willful acts. With respect to the respondent, we are of the opinion that the charges which were properly brought against him also involved willful conduct, and that 5 U.S.C. §558(c) does not shield him from responsibility for any of the alleged acts he may have committed, regardless of whether or not he had actual knowledge that the conduct was proscribed by 8 CFR 292.3(a).[2] The charges properly levied against the respondent allege conduct which he should have known was wrong. Cf. *Dlugash* v. *Securities and Exchange Commission*, 373 F.2d 107 (C.A. 2, 1967).

The respondent has also raised several questions concerning procedural matters in administrative disciplinary proceedings. He argues that the Service, having brought the action, has the burden of proof, and that the standard which should govern the sufficiency of that proof should be clear and convincing evidence. We agree with these contentions. Although disbarment cases have often been described as sui generis and even likened to inquisitorial proceedings, *e.g.*, *In re Echeles*, 430 F.2d 347 (C.A. 7, 1970); *In re Stivers*, ____ Ind. ____, 292 N.E.2d 804 (1973), both parties have appropriately treated this case as an adversary proceeding, and we perceive no difficulties in assigning the burden of persuasion to the Service. In addition, we have concluded that any allegations of misconduct in disbarment proceedings under 8 CFR Part 292 must be established by evidence that is clear, convincing and unequivocal before discipline may be imposed. Our adoption of this standard, which is quite favorable to the respondent, is consistent with the approach taken in many jurisdictions. See, *e.g.*, *In re Ryder*, 263 F. Supp. 360 (E.D. Va. 1967), affirmed, 381 F.2d 713 (C.A. 4, 1967); *In re Gladstone*, 28 F. Supp. 858 (S.D.N.Y. 1939); *In re Brown*, 101 Ariz. 178, 416 P.2d 975 (1966); *Rodisco* v. *State Bar of California*, 58 Cal. 2d 495, 374 P.2d 803, 24 Cal. Rptr. 835 (1962); *In re Simpson*, 47 Ill. 2d 562, 268 N.E.2d 20 (1971). In addition, the clear, convincing and unequivocal test is one that is familiar to both the Service officers who are charged with developing the record in these cases, and to this Board. Finally, we are of the opinion that more than a mere preponderance of the evidence should be required to deprive an attorney of his right to practice his profession, even if that deprivation extends only to one area of the law.

---

[2] We have been unable to find any case directly following the holding of *Schwebel* with respect to the application of 5 U.S.C. §558(c) to an *attorney*. However, our disposition of the respondent's contention makes it unnecessary for us to determine the proper scope of this statute.

Although we agree with the respondent's position regarding the burden of proof in these proceedings, we cannot endorse his contentions with respect to matters of evidence. Throughout the course of the hearing below the respondent objected to the introduction of hearsay evidence. He contended then and contends now that its use in a disbarment case is inappropriate. It is the respondent's position that hearsay evidence is generally admissible in administrative proceedings because agency officials enjoy an expertise in their given field, and accordingly are able to make proper use of this type of evidence. He argues that since disbarment matters are outside the scope of Service and Board expertise, the rationale behind the relaxation of the rules of evidence does not apply to these proceedings and consequently only legally competent evidence may be admitted or employed in arriving at a disposition of his case. The respondent relies extensively upon *Kivitz v. Securities and Exchange Commission*, 475 F.2d 956 (D.C. Cir. 1973), in asserting this position. *Kivitz* also involved disciplinary proceedings instituted against an attorney by an administrative agency. The agency had employed hearsay evidence quite extensively in determining to discipline the attorney. The court indicated that the hearsay evidence never should have been admitted, and declared that the legally competent evidence against the attorney did not warrant discipline. It is our opinion, however, that *Kivitz* should not be given a broad reading.

We agree that agency expertise has some bearing on the relaxation of the hearsay rule in administrative proceedings. However, administrative expertise, instead of being the fundamental basis for ignoring the traditional rules of evidence, serves primarily as a basis upon which an administrator may independently evaluate complex or expert evidence submitted by a party. It also serves as a basis for juding evidence which has proven reliable or unreliable in the past. The admission of hearsay and other "legally incompetent" evidence is predicated not so much on administrative expertise as on the ability of an administrative tribunal properly to discern the probative force of all the evidence before it.

Much evidence that would be excluded at a jury trial possesses substantial probative value. Its inadmissibility stems from the fear that a jury would be unable either to ignore any prejudicial aspects of the evidence or to evaluate the probative import of the evidence. However, when the trier of fact is not subject to these shortcomings of a jury, the rationale behind the traditional exclusionary rules of evidence is absent. Consequently, it is proper for an administrative adjudicator to admit any relevant evidence, and then accord appropriate weight to that evidence after the entire record has been made. See 2 K. Davis, *Administrative Law Treatise*, §§14.01–.04 (1958, Supp. 1970). Accordingly, we disagree with the respondent's position regarding the admission and use of hearsay evidence in this matter. We can perceive no

valid basis for excluding probative evidence from consideration in this case. See *Reil* v. *United States*, 456 F.2d 777 (Ct. Cl. 1972); *In re Wilson*, 76 Ariz. 49, 258 P.2d 433 (1953).

The respondent has also challenged the manner in which these proceedings have been handled, asserting that he was denied a fair hearing below. Disbarment proceedings have been described as quasi-criminal in nature, with any resulting discipline constituting punishment of the attorney. *In re Ruffalo*, 390 U.S. 544 (1968). Accordingly, the accused attorney is entitled to due process, which includes fair notice of the charges against him and an adequate opportunity to defend. The respondent evidently maintains that the denials of his motions for discovery and for a continuance were an abuse of discretion, because they effectively denied him adequate notice and an opportunity to defend.

Prior to the commencement of the hearing the respondent sought to take the depositions of a number of the individuals who were named or listed in the complaint, and who might be called by the Service to testify during the hearing. During the opening stages of the hearing the respondent renewed this motion, requesting subpoenas to examine certain possible witnesses. In addition, he sought various other forms of discovery, including a list of all the Service's witnesses. He maintains that the witness list was necessary for proper preparation of the defense, because the Service had earlier indicated that it intended to call persons not named in the complaint to testify regarding charges not alleged in the complaint.

Any discipline imposed upon the respondent must be predicated solely upon proof that he engaged in the unethical conduct alleged in the complaint. *In re Ruffalo*, supra. The allegations in the complaint are phrased in terms of the various subdivisions of 8 CFR 292.3(a), and set forth the essential nature of the misconduct which is deemed to warrant discipline.[3] The notice given the respondent of the charges against him comports with requirements of due process of law. The hearing in this matter covered a period of approximately two weeks. The respondent, through his counsel, was afforded ample opportunity to cross-examine the available witnesses against him. The evidence against him was fully disclosed, and he was not denied a reasonable opportunity to defend on the charges levied in the complaint. Although the respondent may have been inconvenienced by the denial of discovery, and particularly by the lack of prior knowledge regarding which witnesses the Service intended to produce, we can discern no prejudicial error in the denial of these requests.[4] Cf. *Morgan Precision Parts* v. *N.L.R.B.*, 444 F.2d 1210

---

[3] The pertinent subdivisions of 8 CFR 292.3(a) are reproduced in the Appendix.

[4] In view of our conclusion that the respondent was not deprived of a fair hearing by the denial of his requests for discovery, we need not explore the question of whether the presiding officer possessed the authority to *compel* those measures of discovery which

(C.A. 5, 1971); *Electromec Design and Develop. Co.* v. *N.L.R.B.*, 409 F.2d 631 (C.A. 9, 1969); *N.L.R.B.* v. *Interboro Contractors, Inc.*, 432 F.2d 854 (C.A. 2, 1970), cert. denied, 402 U.S. 915 (1971).

Prior to the taking of testimony at the hearing, the respondent requested a continuance. He maintains that the presiding officer's refusal to grant the motion for a continuance resulted in a denial of a fair hearing. He asserts that a continuance was made necessary by the refusal to permit discovery, because without a list of Service witnesses, the respondent needed time to investigate persons who might be called by the Service to testify.[5] We fail to see any prejudice to the respondent in this regard. If the respondent was surprised by the testimony of any previously unspecified witness, or if he believed that he had not had an adequate opportunity to cross-examine or to investigate any individual, then his proper course of action was to recall the witness after he had become aware of any pertinent material, or to seek an adjournment in order further to prepare his defense. Cf. *N.L.R.B.* v. *Interboro Contractors, Inc.*, 432 F.2d 854 (C.A. 2, 1970), cert. denied, 402 U.S. 915 (1971); *Quattrone* v. *Nicolls*, 210 F.2d 513 (C.A. 1, 1954), cert. denied, 347 U.S. 976 (1954). The denial of the respondent's motion for a continuance at the commencement of the hearing has not rendered these proceedings unfair.

There are six numbered allegations of misconduct contained in the complaint (Exh. 2). The first ground for discipline is predicated upon the respondent's alleged violation of 8 CFR 292.3(a)(1). The pertinent portion of this regulation provides for the suspension or disbarment of an attorney or representative:

(1) . . . who, being an accredited representative of an organization recognized under §1.1.(j) of this chapter, charges or receives either directly or indirectly any fee or compensation for services rendered to any person, except that an accredited representative of such an organization may be regularly compensated by the organization of which he is an accredited representative . . . .

The Service maintains that this prohibition against private practice by accredited representatives applies to the respondent because he was a regularly compensated employee of a recognized organization. We disagree. The respondent is an attorney; he is not an "accredited representative" within the meaning of this regulation.

· Although section 292 of the Act clearly establishes a right to counsel in certain proceedings under the Act, it also limits the extent of that

---

were sought. See *Miner* v. *Atlass*, 363 U.S. 641 (1960); *United States* v. *Minker*, 350 U.S. 179 (1956); *Federal Maritime Commission* v. *Anglo-Canadian Shipping Co.*, 335 F.2d 255 (C.A. 9, 1964). See also *Coughlan* v. *United States*, 236 F.2d 927 (C.A. 9, 1956).

[5] The respondent has not informed us of the method by which he would have ascertained the identity of these probable witnesses.

right by providing that any representation shall be at no expense to the Government. On the assumption that some representation for indigents is generally preferable to no representation, the regulations permit various classes of responsible individuals to appear on behalf of others before both the Service and the Board. See 8 CFR 292.1. A recognized organization of the character described in 8 CFR 1.1(j) may certify United States citizens of good moral character as its accredited representatives, and these accredited representatives may then appear on behalf of others at the administrative level. See 8 CFR 292.2(b). However, it is our conclusion that the portion of 8 CFR 292.3(a)(1) upon which the Service has based its first allegation was intended only to apply to nonattorneys. The rationale behind permitting responsible persons who are not lawyers to practice immigration law at the administrative level applies only where representation would not otherwise be available to the person concerned. This subdivision of the regulation was intended further to circumscribe the limited permission to represent others which is granted to an accredited representative. We view this regulation merely as a means of preventing a nonattorney from entering the private practice of law.

The Service has argued for a broad interpretation of this provisions however, we can discern nothing *inherently* unethical in permitting an attorney to represent indigents in behalf of a charitable organization while at the same time allowing that attorney to engage in private practice. Certainly abuses can occur, yet an absolute proscription of this activity appears unwarranted. We hold that the term "accredited representative" as used in 8 CFR 292.3(a)(1) does not extend to an individual who qualifies as an "attorney" within the meaning of 8 CFR 1.1(f). Accordingly, the respondent, who qualifies as an "attorney," was not properly charged with a breach of ethics by the first allegation in the complaint.

The second numbered allegation in the complaint charges the respondent with a violation of 8 CFR 292.3(a)(3). The respondent is basically charged with having willfully misled Service employees as to material and relevant facts by the filing of a Form G-28, "Notice of Entry of Appearance as Attorney or Representative," in the case of an alien who had not requested representation by the respondent. The alien allegedly involved in this incident did not testify at the hearing, and the respondent's uncontradicted testimony indicates that the alien did initially desire the service of the respondent (Tr. pp. 512–16).

The Regional Commissioner, in his Recommendation in Disbarment Proceedings, contends that this allegation is also supported by testimony and evidence that the respondent entered appearances on behalf of various aliens as a representative of the League, when in fact these aliens were the respondent's private clients. The appellate trial attor-

ney, however, concedes that the proof in this regard is less than satis-factory. We agree with the appellate trial attorney that the record fails to establish the materiality of these misrepresentations (Transcript of oral argument, pp. 26–27). Moreover, we have serious doubts concern-ing the propriety of the addition of this factual contention after the conclusion of the hearing below. *Compare In re Ruffalo*, 390 U.S. 544 (1968); and *Committee on Professional Ethics & Griev.* v. *Johnson*, 447 F.2d 169 (C.A. 3, 1971), *with Jaffee & Co.* v. *Securities and Exchange Commission*, 446 F.2d 387 (C.A. 2, 1971). The record does not establish that the respondent committed the violation charged in the second allegation.

In its third allegation against the respondent, the Service asserts that the respondent willfully deceived and misled clients by giving them his business cards and by claiming that the cards would permit the clients to remain in the United States until an "expiration date," which was shown on the cards. The respondent admits that he gave his private clients the business cards as alleged by the Service (Tr. pp. 523–25).[6] However, the evidence that the respondent also told his clients that the cards permitted them to remain in the United States is far from clear, convincing and unequivocal.

The Service did not develop this point to any significant extent during the hearing. The testimony of Bertha Perez, a United States citizen who accompanied several of her alien friends during their meetings with the respondent, indicates that the respondent promised to keep certain alien clients in the United States for one year (Tr. p. 116). However, the testimony of Bertha Perez tends to indicate that the respondent did not assert that the *business cards* entitled the aliens to remain in the United States (Tr. pp. 126–27). We have reviewed the record with respect to the Regional Commissioner's Recommendation on this charge, but we have not found the testimony which he cites in his Recommendation to be sufficient proof of the wrong *specified* in the complaint.[7]

---

[6] Examples of these cards are contained in Exhibit 10, Group Exhibit 29, Exhibit 33, Exhibit 44, and Group Exhibit 49. On the reverse side of the cards appeared the following:

Daniel M. Koden, Attorney, is representing Mr. _____ in the acquisition of a resident visa. If any problem should arise concerning the immigration status of this person, please call this office.
Telephone:        [number]
Expiration date _____

[7] To a certain extent the exoneration of the respondent on this allegation is based on a technicality as the charge relates to the proof. However, as we read the third charge in the complaint, the Service is alleging activity akin to the issuance of false immigration documents. We can see a significant distinction between a charge of this nature and that which was proven. The evidence convinces us that the respondent made improper prom-ises to aliens with respect to his ability to prevent their deportation. He did not, however, claim that his issuance of a document could accomplish that feat. The likely difference between that which was alleged and that which was demonstrated, vis-a-vis both the

753

At oral argument the appellate trial attorney for the Service contended that there is other evidence to support a charge under 8 CFR 292.3(a)(4) (Transcript of oral argument, pp. 27–28). It is evidently the position of the Service that the respondent should be disciplined for the manner in which he handled the case of Raymonde Amir Riffe. Miss Amir, who was known as Mrs. Riffe prior to her divorce, testified that she went to the offices of the League in or about May of 1970, upon the recommendation of a friend. She did not know that the respondent was employed at the League, but she was referred to him after she explained her case to someone in the League offices. She further stated that the respondent asked for and received $75 from her, $25 of which was allegedly for a filing fee, and $50 of which was paid because the respondent told her that they charged at the League (Tr. pp. 380–81). Miss Amir also indicated that she paid this amount to the respondent by check and received a receipt which she recalled as having been issued in the name of the League and signed by the respondent (Tr. pp. 381–83). [8]

The respondent, however, testified that he thought Miss Amir came to him as a private client because she was not introduced to him by League personnel, and because she did not have with her a League introduction sheet, called a "face sheet" (Tr. pp. 434–35). In rebuttal, Mrs. Du Val contradicted the respondent's assertions regarding the capacity in which Raymonde Amir Riffe saw the respondent. Mrs. Du Val testified that League records indicate that the respondent opened a League file on Miss Amir, who was then Mrs. Riffe, in April of 1970 (Tr. pp. 598–601; Exh. 52). [9] The League record in this matter (Exh. 52) also indicates that the respondent handled Miss Amir as a League client until he ceased employment at the League.

The evidence against the respondent in connection with the case of Raymonde Amir Riffe is troubling. The Service evidently introduced it as proof that the respondent committed the "misconduct" alleged in the first numbered allegation, which we have held inapplicable in this matter. The appellate trial attorney offers this evidence as proof that the

expectations of his clients and the respondent's defense against this charge, bears heavily on our approach to this allegation.

[8] It should be noted that the cancelled check for the $75 payment was *not* introduced into evidence, although checks indicating subsequent payments by the witness to the respondent were introduced (Ex. 41; Tr. pp. 386–87). In addition, the witness' recollection regarding receiving a League receipt is not entirely consistent with the testimony of Ione Du Val, the respondent's immediate superior at the League. Mrs. Du Val testified that she reviewed the carbon copies of all League receipts issued during the respondent's employment at the League (Tr. p. 188) and that she found no receipts issued by the respondent or the respondents secretary to any of the aliens listed in allegation number one of the complaint (Tr. pp. 191–94). Raymonde Amir Riffe is listed in this charge under the name Raymonde Riffe.

[9] These League records were evidently kept in the ordinary course of business (Tr. pp. 603–04; 609–10).

respondent willfully deceived a client, and maintains that the respondent may be disciplined on that basis. Although the testimony of Miss Amir would be more persuasive if buttressed by the cancelled check which she contends was presented to the respondent in May of 1970, there is nevertheless substantial evidence in the record that the respondent deceived both Miss Amir and the League by *requiring* the payment of a nominal fee for legal services which was then not deposited with the League.[10] We need not, however, decide whether this evidence would support a specific allegation of misconduct in this respect. The complaint does not provide the respondent with adequate notice that his alleged willful deception both of Miss Amir and of the League constitutes a ground for discipline. *Jaffe & Co.* v. *Securities and Exchange Commission*, 446 F.2d 387 (C.A. 2, 1971). Moreover, the complaint cannot be amended at this stage in the proceedings without affording the respondent a full opportunity to defend. *Coughlan* v. *United States*, 236 F.2d 927 (C.A. 9, 1956); *In re Farris*, 229 Ore. 209, 367 P.2d 387 (1961). See also *In re Ruffalo*, 390 U.S. 544 (1968).

The fourth numbered allegation against the respondent is also predicated upon 8 CFR 292.3(a)(4) and charges that he willfully misled and deceived Bertha Tulia Torres by purporting to represent her for a $550 fee and by: (a) falsely advising her that she could remain in the United States on the basis of an "extension" card; (b) falsely advising her that she could accept employment; and (c) failing to represent her in any manner. The charge that the respondent deceived Miss Torres by informing her that the respondent's business card permitted her to remain in the United States appears to be a reiteration of the charge levied in the third numbered allegation, which we found not to be sustained by the evidence in the record. However, the other two contentions regarding the deception of Miss Torres raise new issues.

The evidence, however, is less than clear, convincing and unequivocal with respect to the charge that the respondent falsely advised Miss Torres that she could accept employment. Miss Torres testified that this information was conveyed to her by the respondent through an interpreter, named Mr. Angulo (Tr. pp. 37–39, 52). The only other *direct* evidence that the respondent falsely informed aliens that they were permitted to work came from Stella Swider, a United States citizen who acted as an interpreter between the respondent and an alien client of his (Tr. pp. 247, 249). However, in neither instance was the precise nature of the respondent's assertions concerning an alien's eligibility to work completely brought out. The respondent, on the other hand, testified

[10] The respondent, of course, maintains that Miss Amir was always a private client; however, he acknowledged that he has no present record of her as a private client, and that he may have charged her a small fee when their relationship was first established in the spring of 1970 (Tr. pp. 434–35; 488–92).

that he made no such blanket statement to his clients, but instead simply explained each client's legal position and permitted the client to determine an appropriate course of action regarding employment (Tr. pp. 530–31). The Service was unable to rebut this aspect of the respondent's testimony. Moreover, the evidence which was presented to substantiate the charge is consistent with the respondent's explanation of his conduct, especially when considered in view of language translation difficulties.

The evidence regarding whether the respondent misled Miss Torres by accepting a $550 fee, purporting to represent her, and not in fact representing her, is more substantial. The testimony of several witnesses indicates that the respondent made false promises and claims regarding the performance of services for Miss Torres.

Miss Torres testified that she was brought to see the respondent in September of 1970 by a Mr. Angulo, who spoke Spanish and acted as interpreter during the witness' initial meeting with the respondent. At this meeting the respondent told Miss Torres that he would promptly solve her immigration problems (Tr. p. 39). The witness' brother, Dr. Jose Vicente Torres, paid the respondent a total of $550 for services to be rendered on behalf of Miss Torres. Miss Torres became concerned about the manner in which she was being represented, and she finally sought return of the money paid the respondent after her fears were heightened by a newspaper article which "exposed" some of the respondent's alleged practices (Tr. pp. 63–64). When asked to return the $550 fee, the respondent attempted to assure Miss Torres that she need not worry, and he asserted that he needed new information regarding her case (Tr. p. 49). Shortly thereafter the witness filed a criminal complaint against the respondent. The fee which Dr. Torres had paid in connection with his sister's case was then refunded by the respondent (Tr. pp. 44–49).

The respondent's testimony conflicts in certain material respects with that of Miss Torres (Tr. pp. 409–14). The respondent stated that Miss Torres required labor certification if she was to obtain lawful permanent resident status, and that he stressed to her the importance of a job offer. The respondent indicated that Miss Torres was unable to secure an appropriate job offer; however, he asserted that the continued to insist that her efforts in this regard be maintained. He testified that he retained a "continued interest in the case" (Tr. p. 414). In his testimony with respect to another alien, the respondent also stated that he never made a guarantee to solve problems for his clients (Tr. p. 428). Yet he evidently did endeavor to indicate to worried aliens, and in particular to Miss Torres, an approximate date on or about which the aliens could reasonably expect some results in their cases (Tr. pp. 525, 411).

The respondent's assertion that he never made false promises or

claims to aliens is directly contradicted by the testimony of both Bertha Perez and Dr. Jose Vicente Torres. Bertha Perez, who was not a client of the respondent's, testified that the respondent told her to assure the aliens for whom she was translating that he would provide the alien clients with their "residence" within six months (Tr. p. 116). Such a representation could obviously not be properly made (see Tr. pp. 120–22).

Dr. Torres testified that he went to see the respondent twice in 1970 in order to ascertain the extent of services being performed for his sister. In each instance the respondent assured him that Miss Torres had nothing to worry about, and on one occasion the respondent claimed to have filed an application with the Service in behalf of Miss Torres but explained that these matters take quite some time for processing (Tr. pp. 84–86). Dr. Torres further stated that he visited the respondent on the day that the derogatory newspaper article concerning the respondent appeared. On this occasion the respondent also maintained that he was proceeding with work on the Torres case and that everything was "going to be fine" (Tr. pp. 92–93). Dr. Torres was not satisfied with this explanation and he proceeded to inquire of the Service whether the respondent had in fact filed an application in behalf of Miss Torres. He then discovered that the Service had no file relating to his sister. Administrative notice was taken by the presiding officer that the absence of a Service file for Miss Torres indicated that the respondent had not submitted the application to the Service as he had claimed (Tr. pp. 93, 106–09). The respondent did not attempt directly to refute the testimony of Dr. Torres, or to challenge the presiding officer's statement regarding Service procedure in handling applications bearing on an alien's eligibility for lawful permanent resident status (Tr. pp. 400–569).

The testimony of Officer Samuel Sardiga also bears significantly on this allegation against the respondent. Officer Sardiga testified that he was an investigator for the Service and that he personally served the complaint on the respondent (Tr. pp. 252–53). The complaint was served on the respondent while he was in an interview booth evidently located in the offices of the Service in Chicago. The respondent took ten or fifteen minutes to read the complaint and then commented to Officer Sardiga on the charges (Tr. pp. 259–60). When asked to recall what the respondent's statement was, Officer Sardiga replied: "To the best of my knowledge, he indicated that although the charges were true he did not believe we had any good cause for disbarment because he had returned the money to the people involved." (Tr. p. 254.) The respondent has not challenged the accuracy of this testimony, nor has he attempted to explain it in any manner.

Officer Sardiga was not examined as to whether he understood the

respondent's admission to be limited to any particular charge, or charges, in the complaint. Nevertheless, we note that the complaint covers several types of alleged misconduct having no clear relationship to those instances in which the respondent refunded monies to former clients. Consequently, we do not find that the respondent's admission constitutes *strong* evidence in support of every charge in the complaint. Nevertheless, we find Officer Sardiga's testimony regarding this admission to be persuasive evidence that the respondent engaged in the unethical conduct charged in the fourth numbered allegation in the complaint.

On the basis of the summarized testimony we find: (1) that the respondent accepted $550 from Dr. Jose Vicente Torres as a fee for providing legal services to Bertha Tulia Torres; (2) that the respondent promised to obtain lawful permanent resident status for Miss Torres promptly, although he knew that fulfillment of that promise was quite unlikely; (3) that when questioned by Dr. Torres about this matter the respondent maintained that Miss Torres had nothing about which to be concerned that he had performed services on her behalf, both of which representations he knew to be false; and (4) that shortly after the respondent received adverse publicity he further attempted to mislead both Miss Torres and Dr. Torres regarding the status of the Torres case. To the extent that the fourth numbered allegation in the complaint charges the respondent with having misled Miss Torres by asserting that he was representing her when in fact he is not, it is supported by evidence that is clear, convincing and unequivocal.[11]

The allegations numbered five and six in the complaint charge the respondent with a violation of 8 CFR 292.3(a)(5).[12] The fifth allegation in the complaint charges the respondent with unethically soliciting practice by employing a "runner," Mr. Angulo, (a) to distribute certain of the respondent's business cards which stated on their reverse side that the respondent was representing a given alien whose name could then be inserted on the card,[13] and (b) to offer "to pay Bertha Perez the sum of $50.00 for each alien she could refer to him." The complaint's sixth charge alleges that the respondent solicited practice in an unethical manner by employing his runner, Mr. Angulo, to distribute Spanish

---

[11] In arriving at these findings, we have substantially discounted the respondent's version of his relationship with Miss Torres. He is not a credible witness.

[12] Both the Regional Commissioner in his Recommendation, and the Service at the hearing (Tr. p. 18), maintained that the respondent is also charged with a violation of 8 CFR 292.3(a)(6). However, we do not read the complaint as providing the respondent with notice that he is charged under this subdivision of the regulation. None of the allegations in the complaint parallel the language of this provision. Moreover, the Regional Commissioner in his Recommendation has failed to direct our attention to, nor have we uncovered, any evidence that would support such a charge.

[13] A description of these cards is contained in footnote 6.

language advertising cards which contained statements designed to induce aliens with immigration problems to seek assistance from Mr. Angulo.[14] We shall discuss these allegations in combination because there are numerous items of evidence which relate to both charges.

We have found no significant evidence in the record in support of the charge that Mr. Angulo distributed the respondent's business cards, nor has the Regional Commissioner cited any such evidence to us. Mr. Angulo appears to have been known to only a few of the aliens who testified at the hearing. He referred Miss Torres to the respondent, yet Miss Torres testifed that it was the respondent who presented her with the business card in question (Tr. p. 36). The testimony of Bertha Perez is similar in this respect. Although the aliens for whom she acted as translator were contacted by Mr. Angulo, it was the respondent who gave his business cards to these individuals (Tr. pp. 117; 126). Since the record fails to establish that Mr. Angulo participated in a distribution of the respondent's business cards, it is evident that the charge that the respondent unethically solicited clients in this manner has not been proven.

The record, however, does establish that Mr. Angulo, or Dr. Angelo as he was also known, offered to pay Bertha Perez for clients she would refer to the respondent, and that Mr. Angulo distributed the Spanish language advertising cards (Tr. pp. 117–19, 124, 127–29).[15] The issue of whether these allegations of misconduct have been proven then becomes one of whether the record establishes that Mr. Angulo engaged in his efforts of solicitation as an agent or "runner" for the respondent. The regulations do not define the term "runner." However, as used in this context the word generally describes one who seeks out persons with legal difficulties and then directs them to an attorney in consideration for a fee or a percentage of the recovery. *In re Mitgang*, 385 Ill. 311, 331, 52 N.E.2d 807, 816 (1944).

---

[14] An English translation of the Spanish language cards appears in the sixth allegation of the complaint and in Exhibit 46. The translation reads as follows:

IMMIGRATION

Are you working with a tourist visa? Do you have a residency? Do you have papers? Do you want to resolve your situation and legalize your stay in the U.S.?

In a few hours we guarantee tranquility and we give you identification so you can work without problems while we make your arrangements.

Make an appointment at [telephone number] After 5:30 P.M., Saturday and Sunday after 10:00 A.M.

ASK FOR DOCTOR ANGELO

There is substantial testimony in the record that Mr. Angulo also went by the name Dr. Angelo.

[15] The respondent does not challenge the proof on these matters; however, he does contend that there is insufficient evidence to link him to these activities of Mr. Angulo (respondent's brief, p. 22).

Mr. Angulo was unavailable at the hearing, and there was no direct testimonial evidence that the respondent employed Mr. Angulo in this proscribed capacity.[16] Consequently, the evidence against the respondent in this regard consits of circumstantial evidence and the logical inferences to be drawn from that evidence. We perceive no problems with respect to the nature of the evidence presented by the Service. Depending on its probative value, circumstantial evidence along may be sufficient to prove a charge in disbarment cases. See *Millsberg* v. *State Bar of California*, 6 Cal. 3d 65, 490 P.2d 543, 98 Cal. Rptr. 223 (1971); *Meduff* v. *State Bar of California*, 71 Cal. 2d 535, 455 P.2d 800, 78 Cal. Rptr. 696 (1969).

There are several significant items of evidence against the respondent in regard to the issue of whether he employed Mr. Angulo as a "runner." Initially there is the testimony of Bertha Perez to the effect that Mr. Angulo offered to pay the witness $50 for every alien she would refer to the respondent (Tr. pp. 117, 119, 124). As indicated, Mr. Angulo was not available to testify or to be cross-examined. Furthermore, Bertha Perez never acted upon this offer as such, and therefore was never in a position to request payment in accordance with the terms of the offer. Accordingly, the testimony of Bertha Perez as to the statement made by Mr. Angulo is not highly probative of whether she would in fact have been paid; however, the mere fact that an offer of this nature was made to the witness strongly indicates that Mr. Angulo desired to induce the witness to refer aliens to the respondent. It is most questionable whether Mr. Angulo would have cast his remarks to Bertha Perez in this manner had he merely wished to be of assistance to the respondent in the latter's attempt to build a private law practice. Bertha Perez also testified that Mr. Angulo had given her the Spanish language cards and represented that he worked for the respondent (Tr. pp. 119, 124, 128).

The respondent's testimony conflicts with the inferences, both strong and weak, which may be drawn from the testimony of Bertha Perez. The respondent admitted that he knew Mr. Angulo, that Mr. Angulo had referred several cases to him, and that they had had some form of ongoing relationship between September of 1970 and February of 1971 (Tr. pp. 436–37). However, the respondent maintained that he had no arrangement to compensate Mr. Angulo for the referral of clients (Tr. p. 519), and that he did not authorize Mr. Angulo to distribute the Spanish language advertising cards (Tr. pp. 438–39). The respondent asserted that he did not even know of the existence of the Spanish language cards until February of 1971, and that shortly thereafter his relationship with Mr. Angulo terminated (Tr. pp. 439, 564–69, 533–35). The respondent

---

[16] Mr. Angulo evidently disappeared and could not be located by either the Service or the respondent. (See transcript of oral argument, p. 53).

did acknowledge that he had paid Mr. Angulo for translating on several occasions, but further maintained that the translation fees were relatively modest (Tr. p. 520).

The Service called several witnesses to rebut the respondent's assertion in this regard. The testimony of Martin Cabrera indicates that the respondent was willing to attempt to enter into paid referral arrangements. Martin Cabrera was a League employee at the time of the hearing below and at the time the respondent was leaving the League to begin a completely private practice. Mr. Cabrera testified that he worked at a League filed office and had occasion to call the League's legal offices for advice. He stated that the respondent, at about the time of the latter's departure from the League, offered to remunerate the witness in the amount of 25% of the fee collected from any alien whom the witness would refer to the respondent (Tr. pp. 590–93). Although this testimony does not establish that the respondent entered into a similar agreement with Mr. Angulo, it does indicate that the respondent was more than merely amenable to a paid referral system.

The respondent was also contradicted regarding his assertion that he had first encountered evidence of Mr. Angulo's distribution of the Spanish language cards in February of 1971. Robert J. Rafferty, Jr. was an attorney and a co-worker with the respondent for a short period of time at the League. Mr. Rafferty, who was still employed by the League at the time of the hearing, claimed to read and speak Spanish fluently. He testified that in the latter part of 1970 a League client presented him with one of the Spanish language cards. The client explained that the card was obtained from a Dr. Angelo, whose general description matched that of the Mr. Angulo known by the witness to be an acquaintance of the respondent's. The witness asserted that he presented the respondent with this information and asked the respondent whether Mr. Angulo was responsible for distributing the cards. According to Mr. Rafferty, the respondent replied that he had no connection with this Dr. Angelo, and that he was certain that Mr. Angulo and Dr. Angelo were not the same person (Tr. pp. 615–19). The testimony of Mr. Rafferty bears heavily upon the credibility of the respondent, especially as the respondent's testimony relates to his association with Mr. Angulo (see Tr. p. 569).

The respondent sought to have the testimony of Mr. Rafferty excluded from consideration in this case. During the early stages of the hearing the respondent requested the exclusion of witnesses from the hearing room. This motion was granted; however, Mr. Rafferty sat through a substantial portion of the hearing. When the Service called Mr. Rafferty as a rebuttal witness the respondent objected on the ground of the earlier exclusion order. Although it would have been preferable for Mr. Rafferty not to have heard the testimony of the other

761

witnesses, we find no error in the decision to permit Mr. Rafferty to testify.

The rationale behind excluding potential witnesses at a hearing is "to prevent the shaping of testimony by witnesses to match that given by other witnesses." *United States* v. *Strauss*, 473 F.2d 1262, 1263 (C.A. 3, 1973), quoting from *United States* v. *Cozzetti*, 441 F.2d 344 (C.A. 9, 1971). The testimony of Mr. Rafferty was not corroborative of the testimony of any prior witness, but rather was primarily intended as a means of impeaching the respondent. The decision to permit this testimony was proper. *United States* v. *Strauss*, supra; *United States* v. *Ruacho-Acuna*, 440 F.2d 1199 (C.A. 5, 1971); *De Rosier* v. *United States*, 407 F.2d 959 (C.A. 8, 1969).

To the extent that their statements conflict with those made by the respondent, the respondent's credibility was further attacked by the testimony of both Ione Du Val and Betty Gordon, his superiors at the League. Both of these individuals asserted that on two occasions during the latter portion of his stay at the League the respondent was questioned as to whether he was engaging in private practice. They reported that in each instance the respondent denied having an independent law practice (Tr. pp. 139–40, 176–78). At the hearing the respondent admitted that he had had a private practice while at the League (Tr. pp. 477–78); however, he denied that he had been questioned by his superiors at the League regarding that practice until December of 1970 (Tr. pp. 419–23, 549–50). Although both Ione Du Val and Betty Gordon indicated that they were no longer on the best of terms with the respondent, they nevertheless retained a favorable impression as to the quality of the work which the respondent performed for them at the League (Tr. pp. 167, 196). The record indicates that they were attempting to be honest in their account of their meetings with the respondent.

The respondent's credibility at this hearing and his candor as to his practice of law were also called into question by the testimony of Maria Mikulicz, one of the respondent's clients, and by the testimony of Stella Swider, who acted as an interpreter between the respondent and Maria Mikulicz. These two individuals maintained that the respondent refused to issue receipts for substantial cash payments made in connection with the respondent's representation of Mrs. Mikulicz (Tr. pp. 220–21, 242–43). The respondent denied ever *refusing* to issue a receipt; however, he did acknowledge that on occasion he may have accepted cash without making out a receipt (Tr. pp. 481–83). The respondent testified that he kept a private receipt book while working at the League. He did not, however, produce a copy of any receipt issued to either Maria Mikulicz or Stella Swider.

As has been indicated throughout the course of this opinion, the respondent's testimony conflicts with that of numerous other witnesses

in material respects. He is not a credible witness. Our disbelief of the respondent, coupled with the other evidence against him and the almost inescapable inferences to be drawn from that evidence, convinces us that the respondent and Mr. Angulo entered into a compensated client referral arrangement. We are also persuaded that Mr. Angulo must be considered to have been operating as the respondent's "runner" in offering to pay Bertha Perez $50 for every alien she would refer to the respondent and in distributing the Spanish language advertising cards. There is little evidence to indicate that the respondent directly authorized this specific activity; however, the solicitation engaged in by Mr. Angulo was a direct consequence of the opportunity for monetary remuneration which his arrangement with the respondent afforded. The respondent, by entering into an arrangement proscribed by 8 CFR 292.3(a)(5), placed Mr. Angulo in a position which encouraged Mr. Angulo to solicit clients. Accordingly, the respondent must be charged with responsibility for those actions of Mr. Angulo which were taken in furtherance of the arrangement. See *In re Mitgang*, 385 Ill. 311, 52 N.E.2d 807 (1944); *Belli v. State Bar of California*, 10 Cal. 3d 824, 519 P.2d 575, 112 Cal. Rptr. 527 (1974). We find the proof as to these allegations to be clear, convincing and unequivocal.

The Service has contended that the respondent engaged in other forms of misconduct as well. While the proof as to these matters is far from satisfactory, of greater significance is the simple fact that the Service failed to give the respondent notice as to these charges. Consequently, the respondent may be disciplined only for his deception of Miss Torres as set forth in a portion of the fourth numbered allegation, and for the conduct of Mr. Angulo shown to have been in furtherance of the referral agreement.

The Service also introduced several items of evidence which we have not employed in making our findings of fact. With respect to the charges involving Mr. Angulo's conduct as a "runner," the Service has emphasized as proof certain testimony given by Samuel Sardiga, a Service officer. Officer Sardiga stated that he once asked the respondent for a list of the respondent's "runners," which the respondent provided (Tr. pp. 254–55). The respondent denied that the term "runner" was used by Officer Sardiga during the conversation in question (Tr. pp. 425–26). In any event, the list of alleged "runners" does not include Mr. Angulo; consequently, the testimony of Officer Sardiga is only of inferential weight in determining whether Mr. Angulo was a "runner" for the respondent. The Service, however, failed to call any of these alleged "runners" as witnesses, or otherwise to prove that they acted as "runners" for the respondent. We have given credence to the statements of Officer Sardiga; nevertheless, we remain unconvinced that the conversation in question involved more than a mere misunderstanding of terms

between the respondent and Officer Sardiga. Since we believe that this evidence has no probative force with respect to the charges specified in the complaint, we need not confront the respondent's contention that this evidence was procured in violation of the constitutional principles set forth in *Miranda* v. *Arizona*, 384 U.S. 436 (1966), and *Massiah* v. *United States*, 377 U.S. 201 (1964). (Respondent's brief, pp. 23-24.)

The Service did offer some proof that one of the persons named in the list of runners (Exh. 28) had acted in this proscribed capacity for the respondent. One witness called by the Service, a Mr. Jesus Pacheco, testified that in March of 1972 he listened to a Spanish language radio advertisement which was directed toward aliens with immigration difficulties. He called the telephone number mentioned in the advertisement and discussed his problem with a Mr. Lozano. Mr. Lozano then referred the witness, who needed representation at a deportation hearing, to the respondent (Tr. pp. 356-63). Mr. Lozano evidently was not qualified to represent persons in deportation proceedings. The respondent denied authorizing, or knowing of, the radio announcement. The respondent also asserted that Mr. Lozano sometimes handled minor immigration matters himself, and thus may have been soliciting in his own behalf (Tr. pp. 537-38).

The Service did not question the witness who heard the radio advertisement as to either the scope of the services offered by Mr. Lozano or the precise wording of the announcement.[17] The Service did not call Mr. Lozano as a witness, or show that Mr. Lozano was not advertising for his own business. In addition, the fact that the witness required the assistance of a person qualified to represent others at a deportation hearing is consistent with the respondent's version of this incident; it would explain why the witness was referred to the respondent if Mr. Lozano was in fact seeking his own clients. Finally, the separation in time between the events related by Jesus Pacheco and the events described in the complaint, a period of approximately one year, further weakens this evidence as it inferentially bears on the respondent's association with Mr. Angulo.

The final item of proof which we have concluded lacks probative force, and concerning which there was much discussion by the parties, relates primarily to the respondent's credibility.[18] During the hearing, the respondent testified that he had never advertised his immigration prac-

---

[17] The Service did begin questioning the witness regarding the nature of the advertisement; however, on the basis of the responses in the record, it is doubtful whether the witness could have adequately described the announcement. The witness did indicate that the radio advertisement discussed procurement of immigrant visas. This is not inconsistent with the respondent's explanation of his relationship with Mr. Lozano.

[18] There is no specific charge in the complaint relating to this alleged conduct. Consequently, its principal bearing in this case relates to the respondent's veracity.

tice (Tr. pp. 480, 537–38). In rebuttal, the Service introduced a copy of a newspaper "reply" or "advertisement," ostensibly paid for by the respondent. (See Group Exh. 51.) The Service did not affirmatively demonstrate that the respondent had purchased the newspaper space. However, in the absence of contradictory evidence, we believe that there is sufficient basis upon which to connect the respondent with this "article." Cf. *U.S. ex rel. Vajtauer* v. *Commissioner of Immigration*, 273 U.S. 103 (1927). The "article" nevertheless can arguably be interpreted as a reply to the earlier Chicago Sun-Times exposé, and not necessarily as an advertisement for business. We do not mean to imply that the "article" was an entirely proper exercise of the respondent's first amendment rights, because much of its language appears designed to attract clients. See *Belli* v. *State of California*, 10 Cal. 3d 824, 519 P.2d 575, 112 Cal. Rptr. 527 (1974). However, the respondent cannot be disciplined on the basis of the newspaper "article," because it was not specifically charged as an act of unprofessional solicitation of practice. Moreover, the respondent, conceivably viewing the "article" as a "reply" to accusations, may not have been attempting to deceive when he testified that he never advertised his law practice. Giving him the benefit of the doubt, we have not considered this proof in judging the case.

We are of the opinion that the respondent should be suspended from practice before the Service and this Board for a period of one year. Although the respondent's deception of Miss Torres cannot be condoned, the record does reflect that he was under stress at the time of his departure from the League and during the weeks following the publication in a Chicago newspaper of an article allegedly "exposing" the nature of his practice. It was during these periods of time that some, but not all, of the deception occurred. Furthermore, the respondent did refund the entire amount of the fee to the brother of Miss Torres. We believe that a six month suspension is warranted for this unethical conduct. Since the record does not establish that the respondent actually authorized the activities of Mr. Angulo which we have found to have been undertaken in furtherance a paid referral agreement, a minor reprimand of the respondent is all that we believe warranted. We shall also impose a six month suspension for the violations of the regulations proven under the fifth and sixth numbered allegations. Although there are several mitigating factors in the respondent's case, the proven violations are sufficiently serious to require that the two six month periods of suspension run consecutively.

ORDER: The respondent is suspended from the practice of law before the Immigration and Naturalization Service and before the Board of Immigration Appeals for a period of one year.

*Further order:* The record is certified to the Attorney General for final disposition, and the foregoing order is stayed pending such disposition.

### APPENDIX

### 8 CFR Part 292

## § 292.3 Suspension or disbarment.

(a) *Grounds.* The Board, with the approval of the Attorney General, may suspend or bar from further practice an attorney or representative if it shall find that it is in the public interest to do so. The suspension or disbarment of an attorney or representative who is within one or more of the following categories shall be deemed to be in the public interest, for the purpose of this part, but the enumeration of the purpose of this part, but the enumeration of the following categories does not establish the exclusive grounds for suspension or disbarment in the public interest:

(1) Who charges or receives, either directly or indirectly, any fee or compensation for services which may be deemed to be grossly excessive in relation to the services performed, or who, being an accredited representative of an organization recognized under § 1.1(j) of this chapter, charges or recieves either directly or indirectly any fee or compensation for services rendered to any person, except that an accredited representative of such an organization may be regularly compensated by the organization of which he is an accredited representative;

\* \* \*

(3) Who willfully misleads, misinforms, or deceives an officer or employee of the Department of Justice concerning any material and relevant fact in connecton with a case;

(4) Who willfully deceives, misleads, or threatens any party to a case concerning any matter relating to the case;

(5) Who solicits practice in any unethical or unprofessional manner, including, but not limited to, the use of runners, or advertising his availability to handle immigration, naturalization, or nationality matters:

(6) Who represents, as an associate, any person who, known to him, solicits practice in any unethical or unprofessional manner, including, but not limited to, the use of runners, or advertising his availability to handle immigration, naturalization, or nationality matters . . . .

**Louis P. Maniatis, Member, Dissenting:**

I regret that I cannot join with the majority opinion. I dissent in part and concur in part.

The majority holds that the respondent acted as an attorney and, as such, was not an accredited representative within the meaning of the regulations. It further holds that 8 CFR 292.3(a)(1) applies only to non-attorneys. I have searched the opinion to discover the basis for this

reason to support such a holding (pages 10, 11, 12 and 16 of the opinion).

Respondent claims that ambiguity exists as to whether or not an attorney can be considered a "representative," and he arrives at the conclusion that the effect of the regulation is that an attorney is not to be considered a "representative" (page 3 of respondent's brief). I find no such ambiguity because in the first place, taken in its plain everyday meaning, the word "representative" can include any person acting in a representative capacity, including attorneys.

Secondly, the language of the regulation is clear. If the intent was to rule out attorneys from the scope of the first enumerated misconduct, the drafters of the regulation would have so stated. The majority opinion in my judgment, by an overly simplistic and literal reading of the regulation reaches the conclusion that an attorney cannot be considered a "representative." Literal interpretation of words is not always a safe guide to their meaning, particularly when such an interpretation defeats the manifest purpose of the regulation as a whole. This was clearly pointed out by Judge Learned Hand in the majority opinion in *Peter Pan Fabrics, Inc.* v. *Martin Weiner Corporation*, 274 F.2d 487 (C.A. 2, 1960).

We cannot brush away the fact that the regulation specifically states that "an attorney or representative who is within one or more of the following categories," shall be disbarred or suspended when it is deemed "in the public interest to do so," 8 CFR 292.3(a). It will be noted that the regulation covers both an attorney and representative, if found violating any of the enumerated categories including section 292.3(a)(1). How then, can we arbitrarily rule that an attorney is not included in the category cited by the Service as having violated 8 CFR 292.3(a)(1)?

Lastly, the majority interpretation defeats the clear intent of the regulation. In absolving the respondent from the first allegation of the complaint, the majority opinion states that there is nothing inherently unethical in permitting an attorney to represent indigents for a fee. Such a statement bypasses the facts established at the hearing.

Without going into the detailed opinion of the majority, it must be emphasized that the respondent had entered into a contractual relationship with the charitable organization and had agreed to act as its representative for a stated salary. He was not his own free agent to do as he pleased, but was acting in a representative capacity before the Service.

If we follow the majority rule than it would mean that any organization authorized to appear before the Service must of necessity not employ attorneys as their representatives. That qualified non-attorney representation for indigents is generally preferable to no representation is accepted, but it by no means follows that the regulation intended to bar a charitable organization from its attorney as its representative.

Otherwise it would seem that an indigent, being assisted by a recognized charitable organization, may fall by the way side, since the representative appearing in his behalf cannot be a competent and qualified attorney, knowledgeable in immigration matters, a state of affairs that both the organization and the Immigration and Naturalization Service would undoubtedly prefer and which has been acceptable in the past. All the regulation says is that the accredited "representative," whether an attorney or qualified layman, shall not charge the alien a fee, but shall be recompensed solely by the organization, if at all. I do not see it as a defense that what would be improper conduct for a representative" if he is a layman, suddenly becomes proper conduct because he is also a lawyer.

In this context the regulation embraces the attorney's conduct as a "representative." True that so far as the regulation is concerned there is no reason why an attorney—"representative" cannot have his own practice on the side (however dangerous that may be). But what is required is that when acting as a "representative" there shall be a clear delineation as to his capacity to charge a fee. The evidence clearly establishes that Koden was guilty of the grossest lacity and misconduct, in disregarding this delineation.

In my view, the Service has amply established by the requisite evidence and proof, even under the higher clear and convincing standard of proof adopted by the majority, that tht respondent is in clear violation of the first allegation of the complaint.

I reluctantly concur in the one-year suspension imposed by the majority opinion. I consider respondent to have been guilty of gross misconduct, and of violating the standard of ethics so necessary to upholding the public interest.